## In re BUSPIRONE ANTITRUST LITIGATION.

### No. MDL 1413.

United States District Court,
S.D. New York.

Dec. 5, 2002.

---

**1.** Rule 45 was amended in 1991, and most of the language of subdivision (f) was incorporated into subdivision (e).

Richard B. Drubel, Kimberly H. Schultz, Daniel Kotchen, Boies, Schiller & Flexner, Hanover, NH, Bruce E. Gerstein, Noah Silverman, Adam Steinfeld, Garwin, Bronzaft, Gerstein & Fisher, New York City, for Class Purchaser Plaintiffs.

Jonathan L. Greenblatt, Steven C. Sunshine, Heather Lamberg Kafele, Mary B. Boyle, Shearman & Sterling, Washington, D.C., for Watson Pharma, Inc. and Danbury Pharmacal, Inc.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

The Direct Purchaser Class Plaintiffs in these consolidated matters have moved to compel production of documents withheld as attorney-client privileged by defendants Watson Pharma, Inc. and Danbury Pharmacal, Inc. ("Watson"). Pursuant to Court order, Watson submitted the documents for *in camera* review. For the reasons below, the motion is denied.

## BACKGROUND

The facts underlying this litigation are set forth in *In re Buspirone Patent Litig.*, 185 F.Supp.2d 340 (S.D.N.Y.2002) and *In re Buspirone Patent Litig.*, 185 F.Supp.2d 363 (S.D.N.Y.2002), familiarity with which is assumed. The instant dispute involves documents in Watson's possession that date from the time period 1993 through 1995. The documents have been separated into four groups.[1] Group 1 consists of eleven memoranda prepared by Dr. Edward M. Cohen, then Vice President of Scientific Operations at Schein Pharmaceutical, Inc. ("Schein"), now owned by Watson. These memoranda consist of "updates" of various generic drug projects that were being undertaken at Schein. Dr. Cohen sent the updates on a monthly basis to Schein's patent counsel, Alfred Engelberg, during the period from September 1994 to September 1995. Each memorandum reproduces the prior update or updates for each project and then adds a new update for that particular month. Any given update is rarely more than a paragraph. Along with each memorandum Watson has produced a separate cover page reflecting that, at about the same time Cohen sent the memorandum to Engelberg, he sent copies of the memorandum to nonlegal personnel at Schein.

Group 2 consists of four memoranda or letters from Dr. Cohen to either Engelberg or Eugene M. Pfeifer, Schein's outside counsel in connection with obtaining Food and Drug Administration ("FDA") approval of an application for generic buspirone. Group 3 consists of three memoranda or letters from Dr. Cohen to Pfeifer. With respect to both groups, the documents were also sent at the same time to nonlegal personnel at Schein. Group 4 consists of two memoranda from Dr. Cohen relaying to various personnel at Schein the legal advice given by Engelberg.

Dr. Cohen states that the personnel who received copies of the letters or memoranda in each of the four groups were "key business personnel" involved with the buspirone and generic drug projects. *See* Declaration of Edward M. Cohen in Support of Defendants Watson Pharma, Inc. and Danbury Pharmacal, Inc.'s Opposition to Direct Purchaser Class Plaintiffs' Motion to Compel Watson Pharma, Inc. to Produce Documents Authored by and Sent to Business Persons, dated October 7, 2002 ("Cohen Decl."), ¶ 5.

Watson resists disclosure of these documents on the ground that they are all protected by the attorney-client privilege.

*Law Governing Attorney–Client Privilege*

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."

---

1. The document numbers within each group (including duplicate copies) are as follows: Group 1, numbers 21, 24–32, 34, 36–41, 43–45, 59–66, 68, 70–78, 81; Group 2, numbers 11, 33, 42, 46, 55, 67, 69, 79; Group 3, numbers 11, 23, 55, 83, 84, 207, 208; and Group 4, numbers 35, 58, 146. *See* Defendants' Memorandum of Law, dated October 7, 2002, at 1 n. 1.

Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Because privileges lead to the shielding of relevant evidence, they are recognized "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." Trammel v. United States, 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (citation omitted); accord United States v. Weissman, 195 F.3d 96, 100 (2d Cir.1999) ("Privileges should be narrowly construed and expansions cautiously extended."); In re Horowitz, 482 F.2d 72, 81 (2d Cir.) (since the attorney-client privilege "stands in derogation of the public's 'right to every man's evidence,' ... 'it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle'") (citations omitted), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).

█ The proponent of the privilege bears the burden of establishing its existence. See, e.g., United States v. Int'l Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir.1997). To establish the attorney-client privilege, the proponent must show that there was: "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir.) (citations omitted), cert. denied, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996).

## DISCUSSION

The dispute here centers on whether the documents at issue were created "for the purpose of obtaining" legal advice. Plaintiffs' main argument is that the simultaneous disclosure of the documents to nonlegal personnel within Schein shows that the purpose of these documents was not to obtain legal advice. Plaintiffs also contend briefly that

certain of the documents were created in the "ordinary course of business" and for this reason do not qualify as privileged. Each contention is addressed separately.

### Simultaneous Disclosure

█ Plaintiffs argue that the simultaneous disclosure of the documents to nonlegal personnel at Schein precludes a finding that the purpose of these documents was to seek legal advice. Because plaintiffs do not contest that the documents were disclosed only to employees of the corporation who shared responsibilities in the area with respect to which legal advice was purportedly being sought, there is no issue that the disclosure waived the privilege. See, e.g., Verschoth v. Time Warner, Inc., 2001 WL 546630, at *2–*3 (S.D.N.Y. May 22, 2001) (disclosure to corporate employees who have no responsibility with respect to the matters for which legal advice is sought may result in waiver of the privilege). Instead, plaintiffs rely on case law holding that in order to receive protection, a communication must be made "primarily" for the purpose of seeking legal advice, see, e.g., United States v. Int'l Bus. Machines Corp., 66 F.R.D. 206, 212–13 (S.D.N.Y.1974) ("IBM")—a proposition of law that is well-settled and with which Watson does not disagree. What is disputed is plaintiffs' contention that "documents sent to non-legal and legal personnel for simultaneous review or for informational purposes are not considered created for the primary purpose of securing legal advice...." Memorandum of Law in Support of Direct Purchaser Class Plaintiffs' Motion to Compel Watson Pharma, Inc. to Produce Documents Authored by and Sent to Business Persons, dated September 27, 2002 ("Pl.Mem."), at 4.

Plaintiffs are correct that some case law has stated the broad proposition that documents prepared for "simultaneous review" by legal and non-legal personnel are not subject to the privilege. See, e.g., General Electric Capital Corp. v. DirecTV, Inc. & Hughes Elecs., 1998 U.S. Dist. LEXIS 18940, at *6–*9 (D.Conn. Aug. 19, 1998); In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989, 133 F.R.D. 515, 519 (N.D.Ill.1990); North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 110 F.R.D. 511,

514 (M.D.N.C.1986); *Federal Trade Comm'n v. TRW, Inc.*, 479 F.Supp. 160, 163 (D.D.C. 1979). This principle of law is often attributed to *IBM*, in which the court stated that

> [t]he question of whether a document was prepared primarily to seek legal advice must be resolved by examining the circumstances under which the document was prepared. If the document was prepared for purposes of simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the document is to secure legal advice. Therefore, one of the critical elements of the attorney-client privilege is absent at the outset ... [N]o protection attaches to a document prepared for simultaneous review by legal and non-legal personnel.

66 F.R.D. at 213.

While *IBM's* statement of the law provides support to the plaintiffs' broad assertion that any "review" by nonlegal personnel vitiates the privilege, the facts of the IBM case did not involve the mere sending of a document to both legal and non-legal personnel. Instead, the case involved corporate documents that "request[ed] simultaneous review *of a given problem or practice* by non-legal as well as legal personnel." 66 F.R.D. at 214 (emphasis added); *see also id.* at 212. Thus, IBM does not stand for the proposition that the mere simultaneous review of a document seeking legal advice by non-legal personnel vitiates the privilege. Instead, IBM focuses on whether the document asks non-legal personnel to respond to some problem or issue raised within the document. Where non-legal personnel are asked to provide a response to a matter raised in a document, it cannot be said that the "primary" purpose of the document is to seek legal advice. This is because the response by non-legal personnel by definition cannot be "legal" and thus the purpose of the request cannot be primarily legal in nature.

■ Consistent with this reasoning, at least one case has explicitly recognized that "the mere fact that a document is sent to many non-legal and few legal personnel is not determinative of whether it is privileged." *Baxter Travenol Labs., Inc. v. Abbott Labs.*, 1987 WL 12919, at *5 (N.D.Ill.

June 19, 1987). Indeed, as a logical matter, it makes no sense that the mere sending of a copy of a privileged document to corporate personnel indicates that a document has not been prepared for a predominately legal purpose. Because a corporation can act only through its agents, a large corporation may have a number of individuals who should properly be kept informed of communications to and from counsel on a particular subject matter. Where a document is being provided to such individuals for the purpose of informing them that legal advice has been sought or obtained, that act is not inconsistent with the underlying communication being for the "purpose" of obtaining legal advice.

■ As a result, the fact that a request to counsel was sent simultaneously to non-legal personnel should not by itself dictate the conclusion that the document was not prepared for the purpose of obtaining legal advice. *See, e.g., McCook Metals LLC v. Alcoa, Inc.*, 192 F.R.D. 242, 254 (N.D.Ill.2000) (material privileged that "simultaneously ask[ed] for or relay[ed] legal advice while updating the business people responsible for the operating unit"). To determine whether Watson has met its burden of showing that the particular documents in this case are privileged, the Court relies on the Cohen Declaration and on the Court's *in camera* examination of the documents.

### 1. *Documents in Groups 1–3*

The Cohen Declaration states that all the documents in Groups 1 to 3 were prepared specifically to provide Watson's patent counsel, Engelberg and Pfeifer, with information essential to their rendering legal advice. Cohen Decl., ¶¶ 4–7. Thus, Dr. Cohen declares that the Group 1 updates concerned six projects involving different drugs, including buspirone, and "conveyed information necessary to assist Mr. Engelberg in the preparations for filing patent certifications and about FDA follow-up inquiries on the buspirone patent certifications." Cohen Decl., ¶ 4. Dr. Cohen also states that the documents "provided information related to regulatory and manufacturing problems which had a bearing on the FDA's approval of the buspirone [Abbreviat-

ed New Drug Application ('ANDA')], and thus factored into deliberations about [their] overall legal strategy." *Id.*

As for Group 2, Dr. Cohen states that the documents served the same purposes as those in Group 1 and, in addition, discussed problems "regarding the bioequivalence studies in the ANDA, FDA inspections of the manufacturing facility, studies to validate the manufacturing processes, and the supplier of the active pharmaceutical ingredient (i.e., the raw drug material used to make buspirone tablets)." *Id.,* ¶ 6. The documents in Group 3 were addressed to Pfeifer and were prepared "for the specific purpose of seeking legal advice from Mr. Pfeifer regarding regulatory issues and to provide material information for that purpose." *Id.,* ¶ 7.

■ The Court's review of the documents *in camera* does not provide a basis for doubting the assertions in the Cohen Declaration concerning the purposes of these documents. While the documents do not explicitly solicit legal advice from the attorneys, they qualify as privileged because they consist of "information [sent] to corporate counsel in order to keep them apprised of ongoing business developments, with the expectation that the attorney will respond in the event that the matter raises important legal issues." *In re Pfizer, Inc. Sec. Litig.,* 1993 WL 561125, at *6 (S.D.N.Y. Dec.23, 1993). Such a request is privileged "to the same extent as an explicit request." *Id.* (citations omitted); *see also Knogo Corp. v. United States,* 213 U.S.P.Q. 936, 939 n. 1, 1980 WL 39083 (Ct.Cl.1980) ("The request for legal advice or services need not be an express request, nor need the implied request necessarily appear on the face of the document for which the claim of privilege is made."). It is not of any significance that the information transmitted to the attorney was of a highly technical nature. *See, e.g., Knogo Corp.,* 213 U.S.P.Q. at 940 ("confidentiality required for the successful assertion of the attorney-client privilege can exist in regard to communications [between client and patent counsel] which are primarily technical expositions").

■ The documents reflect that copies were sent to approximately five to ten other corporate employees. Dr. Cohen states that these employees were "key business personnel who were involved in the generic drug projects." Cohen Decl., ¶ 5. He further states that "[t]hese documents were copied to business persons as a straightforward matter of line management practice." *Id.* Dr. Cohen's specific purpose in giving these persons the documents was that they were the "personnel responsible for making decisions on these projects" and he wished to inform them that he had provided this particular information to the attorney. *Id.*

Significantly, Dr. Cohen makes clear that the documents were not to provide "general status information" to these personnel as they "received many other, more detailed documents that were intended for that specific purpose." *Id.* The fact that other methods were used to communicate the substance of what was occurring on the projects to these employees makes plain that the documents were not sent to the attorney as part of an attempt to shield otherwise non-privileged information from discovery. *Cf. In re Air Crash Disaster,* 133 F.R.D. at 519–20 (no attorney client protection for documents that were provided to attorney merely to protect them from discovery). Plaintiffs are free to depose Dr. Cohen (and other personnel) on the projects discussed in these memoranda and there may well be non-privileged documents on these topics as well.

Plaintiffs complain that the Cohen Declaration is insufficient to sustain the privilege because Watson has not explained "why the business persons needed to know the detailed factual information being provided to counsel . . . as opposed to simply knowing that the counsel was being kept apprised of the status of Watson's generic BuSpar." Reply Brief in Support of the Direct Purchaser Class Plaintiffs' Motion to Compel Watson Pharma, Inc. to Produce Documents Authored by and Sent to Business Persons, dated October 11, 2002, at 9. A similar argument was recently rejected in *Federal Trade Comm'n v. GlaxoSmithKline,* 294 F.3d 141 (D.C.Cir.2002), in which the District of Columbia Circuit held that, for purposes of demonstrating that a party maintained the confidentiality of attorney-client privileged documents:

[t]he Company's burden is to show that it limited its dissemination of the documents in keeping with their asserted confidentiality, not to justify each determination that a particular employee should have access to the information therein ... We do not presume [ ] that any business would include in a restricted circulation list a person with no reason to have access to the confidential document—that is, one who has no "need to know."

*Id.* at 147–48. This Court also will not require any further information from Dr. Cohen regarding precisely why it was necessary to keep particular people apprised of the information that was being given counsel.

### 2. *Documents in Group 4*

 The documents in this group consist of memoranda from Dr. Cohen relaying to various nonlegal personnel actual legal advice given by Engelberg. Specifically, these documents concern the buspirone patent certifications, Cohen Decl., ¶ 8, and, in essence, summarize discussions between Dr. Cohen and Engelberg. These documents are also protected under the attorney-client privilege. *See, e.g., Strougo v. BEA Assocs.,* 199 F.R.D. 515, 519–20 (S.D.N.Y.2001) ("although dissemination of privileged information to third parties generally waives attorney-client privilege, the distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege") (citing *Upjohn,* 449 U.S. at 391–92, 101 S.Ct. 677).

#### *Ordinary Course of Business*

Plaintiffs argue briefly that many of the documents they seek were created in the "normal course of business" and, as such, are not entitled to the privilege. Specifically, plaintiffs point to the monthly "update memos" and suggest that the frequency with which these documents were produced indicates they were a "regular part of Watson's business." Pl. Mem. at 6.

It is unclear on what principle plaintiffs are relying. The concept that a privilege may not be available for documents generated·in the "ordinary course of business" is relevant only for purposes of an analysis concerning the work product privilege—spe-

cifically, in determining whether the material was prepared "because of" the anticipation of litigation. *See* Fed.R.Civ.P. 26(b)(3) Advisory Committee's Note (1970 Amendment) ("Materials assembled in the ordinary course of business ... are not under the qualified immunity provided by this subdivision."); *accord United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998). Watson, however, does not seek protection for these documents under the work product doctrine.

Nor do plaintiffs' allegations—assuming them to be true—alter the privileged character of the documents. If Dr. Cohen were providing updates to his attorney for purposes of seeking legal advice as part of the "ordinary course" of Dr. Cohen's responsibilities, none of the elements of the attorney-client privilege would be vitiated. The documents would still consist of communications between client and counsel. It would not change the fact that the documents were intended to be and in fact were kept confidential. Nor would it suggest that these documents were created for a purpose other than that of obtaining legal advice. *See Constr. Prods. Research,* 73 F.3d at 473.

### *CONCLUSION*

For the above reasons, plaintiffs' motion to compel is denied.

SO ORDERED.