******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MICHAEL C. HARRINGTON *v.* FREEDOM OF
INFORMATION COMMISSION ET AL.
(SC 19586)

Rogers, C. J., and Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.*

*Argued April 1—officially released September 6, 2016*

*Michael C. Harrington*, with whom, on the brief, was *Jennifer A. Corvo*, for the appellant (plaintiff).

*Daniel J. Krisch*, with whom, on the brief, was *Daniel E. LaBelle*, for the appellee (defendant Connecticut Resources Recovery Authority).

*Paula Pearlman*, for the appellee (named defendant).

*Opinion*

McDONALD, J. Clients call upon attorneys to provide advice on a range of matters, some that may be purely legal, some that may be purely nonlegal, and others where the line between legal and nonlegal advice is more nuanced. This case provides an opportunity to address the circumstances under which communications relating to both nonlegal and legal advice may be covered by the attorney-client privilege.

The plaintiff, Michael C. Harrington, appeals from the trial court's judgment dismissing his appeal from the decision of the Freedom of Information Commission,[1] which concluded that e-mails that the plaintiff sought from the defendant Connecticut Resources Recovery Authority[2] fall within the exemption from disclosure under the Freedom of Information Act (act) for communications subject to the attorney-client privilege. See General Statutes § 1-210 (b) (10). We conclude that the commission failed to apply the proper standard for assessing the communications at issue, which include communications that the commission characterized as containing a mix of business and legal advice. Therefore, the case must be remanded to the commission for further proceedings.

The record reflects the following undisputed facts. The defendant is a public agency for purposes of the act. It assists Connecticut municipalities in managing, recycling and disposing of their solid waste. See generally *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 438, 970 A.2d 592 (2009). In late 2011, the plaintiff made a request to the defendant, pursuant to the act, seeking disclosure of, among other things: (1) all communications between Thomas Ritter and the defendant's staff and board of directors since January 1, 2007; and (2) all communications between Peter Boucher and the defendant's staff and board of directors since January 1, 2009. Ritter and Boucher are both attorneys with law firms, Brown Rudnick LLP, and Halloran & Sage LLP, respectively, which were under contract to provide legal services to the defendant during the periods at issue.[3] Ritter and Boucher are also registered lobbyists.[4]

The plaintiff filed a complaint with the commission after the defendant failed to promptly produce the communications requested. After preliminary proceedings before the commission, the defendant provided many documents to the plaintiff, but withheld hundreds of others. Evidentiary hearings ensued before a commission hearing officer, where the parties contested whether the withheld documents were exempt from disclosure under the act's exemption relating to the attorney-client privilege.

Although the plaintiff recognized that the defendant bore the burden of proof on this issue, he elected to

present his case first. The plaintiff offered exhibits, as well as the testimony of Laurie Hunt, the defendant's director of legal services and the sole attorney on its staff during the periods at issue. Hunt was the only witness at the hearing. The evidence proffered established the following facts. In 2006, the defendant's president, Thomas D. Kirk, sought approval from the defendant's board of directors to enter into an agreement to retain Ritter as the defendant's consultant and community liaison. Kirk informed the board that the defendant previously had been utilizing Ritter's services under a legal services agreement, even though Ritter's services had "not been of a purely legal nature." One of the board members sought clarification whether Ritter was being hired as an attorney or a community liaison. Kirk responded that Ritter was being retained as a consultant and, in particular, a community liaison. Kirk represented that the new arrangement would provide more transparency and accuracy as to the services provided, as well as a cost benefit because Ritter would be retained for a fixed fee rather than being paid at the hourly rate under the legal services agreement.

Following the board's approval, the defendant entered into various service agreements with Ritter and Brown Rudnick: a Host Community Liaison Services Agreement in 2006; a Municipal Government Advisor Services Agreement in 2007; and a Municipal Government Liaison Services Agreement in 2009 (collectively, liaison agreements). These liaison agreements designated Brown Rudnick, and Ritter specifically, as the defendant's "consultant." One of these liaison agreements described the scope of the consultant's services as, including, but not limited to, the following:

(a) "Provide [the defendant] with insight and outreach relative to [the defendant] and its interactions with municipalities that are currently and/or that may become hosts to the [the defendant's] facilities and pertinent or related groups and organizations that are and/or may become affected by [the defendant's] facilities. . . ."

(b) "Act as a community liaison for [the defendant] to provide counsel and outreach to current and/or potential host communities in connection with local issues in the community and the state of Connecticut in general."

(c) "Recommend to [the defendant] ways to improve outreach to the current and/or potential host communities . . . ."

(d) "Provide counsel to [the defendant] to assist [the defendant] with its critical goals in the current and/or potential host communities, as well as develop and enhance [the defendant's] relationships with [these] host communities."[5]

With one exception, Ritter's services were billed

exclusively under these liaison agreements and were invoiced as "General Business Advice." The only exception was a special agreement, executed in 2011, under which Ritter provided "legislative monitoring and advice" while two bills were pending before the legislature that would have made substantial changes to the operations of the defendant. Accordingly, subsequent to the execution of the liaison agreements, there was no evidence that Ritter ever billed the defendant for providing "legal advice" under the liaison agreements, that he ever billed the defendant under the legal services agreement, or that he billed the defendant under the hourly rate that was prescribed under the legal services agreement.

Hunt testified, however, that the defendant had relied on Ritter and Boucher for legal advice and that such advice often had been provided. Hunt opined that legal advice likely was being solicited in communications, even when the only response to the communication came from a person who was not an attorney. Hunt speculated that legal advice may have been provided in response to some e-mails through some channel other than e-mail. In particular, she stated that "it's also possible to solicit advice through an e-mail but to get a response in a phone call. That frequently happens." She further opined that services provided by Ritter for "monitoring legislation" were legal services, explaining that the defendant has a "legal interest" in proposed legislation that may affect it and that seeking advice on pending legislation is a request for legal advice. Hunt opined that an e-mail from Kirk to both Ritter and the defendant's director of public relations, indicating that Kirk was going to have a meeting with legislators, would be a solicitation of legal advice from Ritter but not the director, under the view that "[s]ometimes it's necessary just to keep the lawyers up to speed on what's going on so that they can provide legal advice."

Hunt addressed two particular controversies in which the defendant was involved, one of which had resulted in several arbitration and judicial proceedings over a period of years. She acknowledged that Ritter had never entered an appearance in any case for the defendant, including arbitration and administrative proceedings.

The defendant submitted two "exemption" logs to the hearing officer, one each for the Ritter and Boucher communications being withheld. The logs listed: the author of each communication; the recipients (distinguishing addressees from persons who were copied); attorneys advising the defendant in connection with that communication (including attorneys associated with law firms other than Brown Rudnick and Halloran & Sage); the subject matter; and the statutory exemption(s) that was being claimed. The subject matter was not stated in terms relating to the specific type of legal advice sought, but instead listed general topics

such as draft testimony, legislative report, landfill siting study, board member solicitations, or new energy legislation.

Following an in camera review of the documents, the hearing officer found that the documents consisted of: (1) e-mails to/from Ritter or Boucher; and (2) e-mails to/from others on which Ritter or Boucher were copied. The hearing officer issued a proposed decision recommending that the commission find that the documents are exempt from disclosure under the attorney-client privilege.

The commission subsequently voted to adopt the hearing officer's decision, despite some reservations that were expressed about whether all of the documents were privileged. In that decision, the commission determined that its legal analysis was guided by the four part test set forth in *Shew* v. *Freedom of Information Commission*, 245 Conn. 149, 158–59, 714 A.2d 664 (1998), for assessing whether a corporate or municipal entity had established an attorney-client privilege: "(1) the attorney must be acting in a professional capacity for the agency, (2) the communications must be made to the attorney by current employees or officials of the agency, (3) the communications must relate to the legal advice sought by the agency from the attorney, and (4) the communications must be made in confidence." (Footnote omitted; internal quotation marks omitted.) The commission noted that "[c]ourts have recognized that the attorney-corporate client privilege raises additional questions because lawyers in this context may have mixed 'business-legal' responsibility which may result in the blurring of business and legal advice," and stated that this court had ruled that the test under such circumstances is whether such communications are " 'inextricably linked' to the giving of legal advice." (Emphasis omitted.)

The commission then concluded that, based on Hunt's testimony and a review of the documents, all four prongs of the *Shew* test had been met as to each communication withheld by the defendant. The commission found that Ritter had provided both municipal liaison services and legal advice, and determined that it was not dispositive that he had been hired and paid pursuant to a contract for the former. As to both Ritter and Boucher, the commission found that "[the defendant] was involved in at least two legal controversies, and was the subject of proposed legislation that potentially would have affected [the defendant's] business, and that such matters are the subject of the Ritter and Boucher e-mails." It further found that, during the four and one-half year span of the communications, "[the defendant's] employees and [b]oard members regularly communicated . . . via e-mail, with [the defendant's] legal counsel, including [Ritter and Boucher], for the purposes of (1) seeking legal advice; and (2) keeping

counsel apprised of ongoing business developments, with the expectation that the attorney would respond in the event the matter raised a legal issue." In light of these findings, the commission concluded that "each of the communications related to legal advice sought by the [defendant] either from . . . Ritter, [Boucher] or another attorney acting on behalf of [the defendant], or both." The commission acknowledged that certain communications contained a mix of legal advice and business advice, but concluded that these communications related to legal advice sought by the agency because they were " 'inextricably linked' to the giving of legal advice."

The plaintiff appealed from the commission's decision to the Superior Court, raising two claims: (1) the commission had improperly substituted the judgment of the hearing officer for its own because, according to the plaintiff, several commissioners indicated that they did not agree that all the documents were privileged but nonetheless adopted the hearing officer's decision; and (2) various factors indicated that the communications were not privileged. The court rejected both the procedural and substantive claims. With respect to the substantive claim, the court indicated that it had conducted an in camera review of the documents and had found substantial evidence to support the commission's findings. The court rejected the plaintiff's claim that the attorney-client privilege would not shield communications between nonlawyers on which Ritter was copied, concluding that there was substantial evidence to support a finding that such communications were made "as part of a design to keep the attorneys involved in [the defendant's] decision-making process." The plaintiff appealed to the Appellate Court, renewing its procedural and substantive claims, and we transferred the appeal to this court.

The plaintiff's principal contention before this court is that the commission improperly deemed the communications at issue to be covered by the attorney-client privilege.[6] He contends that the evidence demonstrates that Ritter and Boucher were not consistently acting in a professional capacity as attorneys for the defendant, but rather were providing business advice, legislative advice, or lobbying services, to which the privilege does not apply. He further contends that, to the extent that the communications were motivated by more than one purpose, they would not be shielded because (a) legal advice must be the predominant or primary purpose of the communications for them to be privileged; and (b) any nonlegal advice must be inextricably linked to legal advice, such that redaction of the latter would not be possible. Finally, he contends that the privilege would not extend to communications on which other Brown Rudnick lobbyists were copied.

In considering these contentions, we are mindful that

"Connecticut has a long-standing, strong public policy of protecting attorney-client communications." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 48, 730 A.2d 51 (1999); see also *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157. "The privilege fosters full and frank communications between attorneys and their clients and thereby promote[s] the broader public interests in the observation of law and [the] administration of justice." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 157, 757 A.2d 14 (2000). Moreover, when a public agency is the client, because "public officials are duty-bound to understand and respect constitutional, judicial and statutory limitations on their authority . . . their access to candid legal advice directly and significantly serves the public interest . . . ." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). At the same time, however, "non-disclosure impinges on open and accessible government." Id.; see also *Reed* v. *Baxter*, 134 F.3d 351, 356 (6th Cir.) (recognizing competing values), cert. denied, 525 U.S. 820, 119 S. Ct. 61, 142 L. Ed. 2d 48 (1998).

Because "the privilege has the effect of withholding relevant information from the [fact finder], it applies only where necessary to achieve its purpose. . . . *Fisher* v. *United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976)." (Internal quotation marks omitted.) *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157–58. The burden of establishing the applicability of the privilege rests with the party invoking it. *Director, Dept. of Information Technology* v. *Freedom of Information Commission*, 274 Conn. 179, 189, 874 A.2d 785 (2005); see also *In re County of Erie*, supra, 473 F.3d 418. "Any privilege there may be is not a blanket one. The limitation, in connection with this communication, frames the special relationship that must be found for each document separately considered." (Internal quotation marks omitted.) *Zenith Radio Corp.* v. *Radio Corp. of America*, 121 F. Supp. 792, 794 (D. Del. 1954). Because the application of the attorney-client privilege tends to prevent the full disclosure of information and the true state of affairs, it is both narrowly applied and strictly construed. *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330, 838 A.2d 135 (2004); *United States* v. *Mejia*, 655 F.3d 126, 132 (2d Cir.), cert. denied sub nom. *Rodriguez* v. *United States*,    U.S.    , 132 S. Ct. 533, 181 L. Ed. 2d 37 (2011).

The same is true with our construction of exemptions under the act. "[T]he overarching legislative policy of [the act] is one that favors the open conduct of government and free public access to government records. . . . [I]t is well established that the general rule under the [act] is disclosure, and any exception to that rule will be narrowly construed in light of the general policy

of openness expressed in the [act]. . . . [Thus] [t]he burden of proving the applicability of an exception [to disclosure under the act] rests upon the party claiming it." (Citation omitted; internal quotation marks omitted.) *Lieberman* v. *Aronow*, 319 Conn. 748, 754–55, 127 A.3d 970 (2015).

When a claim of attorney-client privilege is invoked in an administrative proceeding, our review of a determination as to whether that privilege applies is governed by the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 676, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

Although the plaintiff raises numerous arguments, our threshold, and ultimately dispositive, consideration is the proper approach for assessing the applicability of the attorney-client privilege when business or other nonlegal professional advice is provided. This is a legal rather than factual question. We therefore must consider whether the commission acted unreasonably, arbitrarily, illegally, or in abuse of its discretion in concluding that all of the communications that the defendant withheld are covered by the attorney-client privilege. See *Lash* v. *Freedom of Information Commission*, 300 Conn. 511, 517, 520, 14 A.3d 998 (2011) (citing this standard when reviewing documents and determining that only reasonable conclusion commission could have drawn, had it applied proper standard, was that documents were privileged); see also *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 156, 158 (distinguishing facts found from trier's legal conclusion as to whether report was made in confidence and whether communications were inextricably linked to giving of legal advice so as to bring them within attorney-client privilege); cf. *Director, Dept. of Information Technology* v. *Freedom of Information Commission*, supra, 274 Conn. 187 (when case involves applying well settled meaning of exemptions in § 1-210 [b] to facts of particular case, standard of judicial review is whether commission's factual determinations are reasonably supported by substantial evidence in record taken as whole).

This court has long recognized the principle that "[n]ot every communication between attorney and client falls within the [attorney-client] privilege." *Ullmann* v. *State*, 230 Conn. 698, 713, 647 A.2d 324 (1994). Nonetheless, we have not previously had occasion to squarely address the specific situation in which attorneys give business or other nonlegal professional advice to their clients. Numerous other courts, however, have confronted this issue. As one court explained: "The communication must be made by the client to the attorney acting as an attorney and not, e. g., as a business advisor. . . . In sum, attorneys do not act as lawyers when not primarily engaged in legal activities. . . . [Moreover], it would seem obvious that business communications cannot be insulated from discovery by virtue of the mention of an attorney's name, or their being directed to an attorney." (Citations omitted; internal quotation marks omitted.) *Barr Marine Products Co.* v. *Borg-Warner Corp.*, 84 F.R.D. 631, 634–35 (E.D. Pa. 1979); accord *Wachtel* v. *Health Net, Inc.*, 482 F.3d 225, 231 (3d Cir. 2007) ("[B]ecause the purpose of the privilege is to promote the dissemination of sound legal advice, the privilege will extend only to advice which is legal in nature. Where a lawyer provides non-legal business advice, the communication is not privileged."); *Burden-Meeks* v. *Welch*, 319 F.3d 897, 899 (7th Cir. 2003) ("[h]iring lawyers to do consultants' work does not bring a privilege into play"); *Matter of Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988) ("[a] business that gets marketing advice from a lawyer does not acquire a privilege in the bargain"); *Fox News Network, LLC* v. *United States Dept. of the Treasury*, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012) ("[t]he attorney-client privilege protects only legal advice, not economic, business, or policy advice").

The line between legal advice and business advice, however, is not always clear. "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct. See generally 1 [P.] Rice, Attorney Client Privilege in the United States [(2d Ed. 1999) § 7:9]. It requires a lawyer to rely on legal education and experience to inform judgment. . . . But it is broader, and is not demarcated by a bright line. . . . The modern lawyer almost invariably advises his client upon not only what is permissible but also what is desirable. And it is in the . . . public interest that the lawyer should regard himself as more than [a] predicter of legal consequences. His duty to society as well as to his client involves many relevant social, economic, political and philosophical considerations. And the privilege of nondisclosure is not lost merely because relevant nonlegal considerations are expressly stated in a communication which also includes legal advice." (Citation omitted; internal quotation marks omitted.) *In re County of Erie*, supra, 473 F.3d 419–20, quoting *United States* v. *United*

*Shoe Machinery Corp.*, 89 F. Supp. 357, 359 (D. Mass. 1950).

Nonetheless, it is not enough for the party invoking the privilege to show that a communication to legal counsel relayed information that "might become relevant to the future rendering of legal advice. Instead, the communication must also either explicitly or implicitly seek specific legal advice about that factual information." *Valente* v. *Lincoln National Corp.*, Docket No. 3:09cv693 (MRK), 2010 WL 3522495, \*3 (D. Conn. September 2, 2010); see also *Simon* v. *G.D. Searle & Co.*, 816 F.2d 397, 403–404 (8th Cir.) ("A business document is not made privileged by providing a copy to counsel. . . . Client communications intended to keep the attorney apprised of business matters may be privileged if they embody an implied request for legal advice based thereon." [Internal quotation marks omitted.]), cert. denied, 484 U.S. 917, 108 S. Ct. 268, 98 L. Ed. 2d 225 (1987); *Hercules, Inc.* v. *Exxon Corp.*, 434 F. Supp. 136, 144 (D. Del. 1977) ("[c]lient communications intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice based thereon, or self-initiated attorney communications intended to keep the client posted on legal developments and implications may also be protected").

Just as this court has never specifically distinguished business advice offered by an attorney from legal advice, it has not addressed the application of the privilege to communications containing or seeking both legal and business advice, as was found to exist in the present case. The primary flaw in the commission's approach to this question lies in its exclusive reliance on the "inextricably linked" standard. That language, however, originates from a case in which this court stated that, "[a] communication from attorney to client *solely regarding a matter of fact* would not ordinarily be privileged, *unless it were shown to be inextricably linked to the giving of legal advice.*" (Emphasis added.) *Ullmann* v. *State*, supra, 230 Conn. 713; see, e.g., *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 158–64 (factual report prepared by environmental consulting firm retained by counsel to assist in responding to order issued by Department of Environmental Protection was inextricably linked to legal advice on how to respond to order); *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157 (facts elicited by attorney in investigation that informed basis of legal advice rendered facts uncovered in that investigation inextricably linked to that advice). This court has never indicated that the "inextricably linked" standard governs a determination whether a communication containing or seeking both business and legal advice would be privileged in its entirety.

There is broad consensus in other jurisdictions that, "if the non-legal aspects of the consultation are integral

to the legal assistance given and the legal assistance is the *primary purpose* of the consultation, both the client's communications and the lawyer's advice and assistance that reveals the substance of those communications will be afforded the protection of the privilege."[7] (Emphasis in original; footnotes omitted.) 1 P. Rice, Attorney-Client Privilege in the United States (Rev. 2015) § 7:4, pp. 1191–92; see also *Lindley* v. *Life Investors Ins. Co. of America*, 267 F.R.D. 382, 392 (N.D. Okla. 2010) ("[w]here . . . the legal and business purposes of the communication are inextricably intertwined, the entire communication is privileged only if the legal purpose outweighs the business purpose"), aff'd in part as modified, Docket No. 08-cv-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. April 28, 2010); *Neuder* v. *Battelle Pacific Northwest National Laboratory*, 194 F.R.D. 289, 292 (D.D.C. 2000) ("[w]here business and legal advice are intertwined, the legal advice must predominate for the communication to be protected").

When the legal aspects of the communication are incidental or subject to separation, the proponent of the privilege may be entitled to redact those portions of the communication. See *In re County of Erie*, supra, 473 F.3d 421 n.8 ("redaction is available for documents which contain legal advice that is incidental to the non-legal advice that is the predominant purpose of the communication"); *Hercules, Inc.* v. *Exxon Corp.*, supra, 434 F. Supp. 147 ("The problem remains . . . of separating out business from legal advice. . . . The [c]ourt recognizes that business and legal advice may often be inextricably interwoven. A single proposed course of conduct . . . will have both legal and business ramifications, and the lawyer may advise as to both in a single communication. . . . [Nonetheless], it is necessary to separate out the two, in the interest of preserving the integrity of the privilege itself . . . ." [Citation omitted.]); G. Sisk & P. Abbate, The Dynamic Attorney-Client Privilege, 23 Geo. J. Legal Ethics 201, 223 n.121 (2010) ("[t]he exacting and detailed segregation of privileged from unprivileged portions of an otherwise integrated communication and the redaction of the privileged sections while disclosing the remainder is a process that generally should be reserved to the situation in which the overwhelming purpose of the communication was non-legal and thus the legal advice is an incidental element of the communication"). When such separation is not possible, both may be protected, as long as the primary purpose is legal advice. See *In re Vioxx Product Liability Litigation*, 501 F. Supp. 2d 789, 798 (E.D. La. 2007) ("When these non-legal services are mixed with legal services it does not render the legal services any less protected by the privilege. In fact, they both are protected when they are inextricably intertwined."); *Kent Literary Club* v. *Wesleyan University*, Superior Court, judicial district of Middlesex, Docket No. CV-15-6013185-S (April 12, 2016) ("[w]ith regard to whether

the communications at issue were 'inextricably linked to the giving of legal advice,' a determination must be made that the claimed privileged matter is so intertwined with [a] non-privileged matter that it cannot be redacted or otherwise separated"); *Marsh* v. *Safir*, Docket No. 99CIV.8605JGKMHD, 2000 WL 460580, *8 (S.D.N.Y. April 20, 2000) ("if the protected and non-protected purposes of the communications are inextricably linked, thus precluding any separation of the communications into the privileged and non-privileged categories, the communications will be protected").

"Lest a non-legal element become the tail that wags the dog, a clear and significant nexus between attorney-client communications and legal advice or assistance is rightly expected. In classifying the character of the communication, the crucial inquiry is whether the intent of the client, in deciding to approach the lawyer, is to obtain legal counsel, even if other dimensions of a matter are addressed as well." G. Sisk & P. Abbate, supra, 23 Geo. J. Legal Ethics 219–20.

This court has signaled our approval of the primary purpose standard applied by other courts. See *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 163–64; see also *Kent Literary Club* v. *Wesleyan University*, supra, Superior Court, Docket No. CV-15-6013185-S ("[t]he Connecticut [Supreme Court] cited with approval in *Olson* the conclusion in *Cuno, Inc.* v. *Pall Corp.*, 121 F.R.D. 198, 204 [E.D.N.Y. 1988], that where a lawyer mixes legal and business advice the communication is not privileged unless the communication is designed to meet problems which can fairly be characterized as predominantly legal" [internal quotation marks omitted]); *West Hartford* v. *Taubman Centers, Inc.*, Superior Court, judicial district of Waterbury, Docket No. CV-075007876-S, 2009 WL 1578485, *2 (May 21, 2009) ("The Connecticut Supreme Court has stated that the proper approach in a situation such as the [present] case is to apply the privilege where the communications at issue are inextricably linked to the giving of legal advice. . . . With regard to documents, the Supreme Court has similarly approved a case-by-case inquiry into the primary purpose of the document." [Citation omitted; internal quotation marks omitted.]). We now expressly hold that the primary purpose standard governs such inquiries.

In the present case, the commission's decision cited to cases from other jurisdictions that apply this standard, but it did not determine whether the primary purpose of the communications was seeking or providing legal advice. Nor did it consider whether incidentally privileged matters could be redacted to allow disclosure of nonprivileged matters. Indeed, Hunt stated that redaction would have been possible as to some documents, but she lacked sufficient time to do so. Our review of a sample of the communications reveals that

proper application of these considerations undoubtedly would yield a different result as to a substantial number of the communications examined.[8] Indeed, some of the e-mails exclusively addressed nonlegal matters, such as eliciting employment opportunities, facilitating business connections or opportunities, and burnishing the defendant's public image, that could not reasonably be found to have been inextricably connected to legal advice. Nor were they all inextricably connected to certain legal controversies or proposed legislation, as the commission's decision suggested.

Therefore, the case must be remanded to the commission for further proceedings. See *Lash* v. *Freedom of Information Commission*, supra, 300 Conn. 516 ("any remand for further factual findings properly would be to the commission, not to the trial court"). The commission may allow the parties to present further evidence or argument to aid it in its application of the primary purpose test and to allow the parties to create an adequate record as to the commission's application of that test to particular communications that would permit appropriate appellate review should that become necessary. See footnote 8 of this opinion.

In reconsidering this matter, we draw the commission's attention to other concerns about certain aspects of its decision. The commission concluded that the privilege would attach to communications spanning more than a four year period that were made to keep "counsel apprised of ongoing business developments, with the expectation that the attorney would respond in the event the matter raised a legal issue." As we previously indicated, it is not enough for the party invoking the privilege to show that factual information "might become relevant to the future rendering of legal advice. Instead, the communication must also either explicitly or implicitly seek specific legal advice about that factual information." *Valente* v. *Lincoln National Corp.*, supra, 2010 WL 3522495, *3. The commission's decision does not distinguish communications that expressly sought legal advice from those that did not. Moreover, nothing in its decision indicated that it had given any weight to certain facts that would be relevant in ascertaining whether there was an implied request for legal advice. Specifically, the commission drew no distinction between communications on which Ritter and/or Boucher were primary recipients (addressees) and those on which they were merely copied. Nor did the commission appear to give any weight to the fact that the evidence clearly established that Ritter's primary role was not as an attorney, but as a consultant and liaison. Although we agree with the commission that Ritter *could* provide legal advice, his primary role providing other services would seem to require a clear basis to conclude that information was being conveyed to him for the purpose of having him act in the role of legal advisor or that he was providing a legal opinion. Extrinsic evidence may

undoubtedly provide context for making such an assessment.

In addition, the commission appears to have assumed that communications relating to "proposed legislation that potentially would have affected [the defendant's] business" related to legal advice. An authoritative treatise has noted that "[i]t is unresolved whether legal advice should be interpreted differently when it is given in the context of the creation of laws (or regulations in the context of government agencies), as opposed to when it is given [in] the context of existing law. It is not apparent how the attorney-client privilege's policy of effectuating greater compliance with the law through the encouragement of more open communications to the attorney is furthered in the legislative context." 1 P. Rice, Attorney-Client Privilege in the United States (Rev. 2015) § 7:20, pp. 1276–77. Nonetheless, without expressing any opinion as to whether either Ritter or Boucher had been acting as a lobbyist, or merely aiding someone else acting in that capacity, we set forth the following principles to guide the commission on remand. "[I]f a lawyer happens to act as a lobbyist, matters conveyed to the attorney for the purpose of having the attorney fulfill the lobbyist role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice to the client, including advice on matters that may also be the subject of the lobbying efforts." (Internal quotation marks omitted.) *In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270, 285 (S.D.N.Y. 2001); see also *United States Postal Service* v. *Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 164 (E.D.N.Y. 1994) ("[l]obbying conducted by attorneys does not necessarily constitute legal services for purposes of the attorney-client privilege"). "Summaries of legislative meetings, progress reports, and general updates on lobbying activities do not constitute legal advice and, therefore, are not protected by the work-product immunity." *P. & B. Marina, Ltd. Partnership* v. *Logrande*, 136 F.R.D. 50, 59 (E.D.N.Y. 1991). "If a lawyer who is also a lobbyist gives advice that requires legal analysis of legislation, such as interpretation or application of the legislation to fact scenarios, that is certainly the type of communication that the privilege is meant to protect." (Internal quotation marks omitted.) *A & R Body Specialty & Collision Works, Inc.* v. *Progressive Casualty Ins. Co.*, Docket No. 3:07CV929 (WWE), 2013 WL 6044342, *3 (D. Conn. November 14, 2013); see also *Robinson* v. *Texas Automobile Dealers Assn.*, 214 F.R.D. 432, 445–46 (E.D. Tex. 2003) ("If advice is characterized as merely political, rather than legal, it is also not protected. . . . And a communication telling a lobbyist what to disclose to a legislator in the course of lobbying efforts has been held to be unprotected because it contemplates disclosure to a third party." [Citation omitted.]), vacated in part on

other grounds sub nom. *In re Texas Automobile Dealers Assn.*, Docket No. 03-40860, 2003 WL 21911333 (5th Cir. July 25, 2003).

Finally, we note that the commission's decision does not reflect any consideration of the inclusion of third parties on the communications. "[S]tatements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality . . . ." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 157. Nonetheless, "[t]he presence of certain third parties . . . who are agents or employees of an attorney or client, and who are necessary to the [legal] consultation, will not destroy the confidential nature of the communications." (Internal quotation marks omitted.) Id.; id., 160 ("the privilege must include all the persons who act as the attorney's agents when the assistance of the agent is indispensable to the attorney's work" [internal quotation marks omitted]); see also *United States* v. *Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (attorney-client privilege may cover "communications made to certain agents of an attorney . . . hired to assist in the rendition of legal services"). For example, Timothy Shea, a director in the Government Law & Strategies practice group at Brown Rudnick, who is not an attorney, was copied on some of the sought after e-mails. There was no finding that Shea was acting as Ritter's agent in the rendition of any legal services with respect to any particular matter at hand. Therefore, on remand, the commission should consider this issue. See *In re County of Erie*, supra, 473 F.3d 423 ("[a]lthough the e-mails at issue were generated for the predominant purpose of legal advice, we remand for the district court to determine whether the distribution of some of the disputed e-mail communications to others within the Erie County Sheriff's Department constituted a waiver of the attorney-client privilege").

The judgment is reversed and the case is remanded with direction to sustain the plaintiff's appeal and to remand the matter to the commission for further proceedings consistent with this opinion.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Justice Eveleigh was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

¹ Although the commission is the named defendant, for convenience, we refer to the defendant Connecticut Resources Recovery Authority, the entity from whom the records were sought, as the defendant, and refer to the commission by name. The commission has not filed an appellate brief, and has joined in the brief of the defendant.

² In 2014, the legislature renamed the Connecticut Resources Recovery Authority as the Materials Innovation and Recycling Authority. Public Acts 2014, No. 14-94, § 1; see General Statutes § 22a-260a.

³ Halloran & Sage was contracted to provide general counsel as its primary legal service to the defendant. Brown Rudnick was contracted to provide legal services in the following specific areas under its contract effective July,

2005: environmental; real estate/planning and zoning; energy/Department of Public Utility Control; and litigation. Ritter is a partner in the Government Law & Strategies practice group of Brown Rudnick.

[4] By statute, the defendant is barred from hiring outside lobbyists but it may lobby through its own employees. See General Statutes § 1-101bb; see also General Statutes § 1-91 (11) (defining lobbying). We agree with the commission's hearing officer that, despite the plaintiff's assertion that Ritter and Boucher were lobbying on behalf of the defendant, such a fact, even if true, would not necessarily be determinative of the question of privilege.

[5] In an e-mail to Paul Nonnenmacher, the defendant's director of public affairs, Ritter similarly described his role as formulating strategy and inter-acting with others to help advance the defendant's business goals. Ritter made no mention of his availability for legal advice.

[6] In light of our conclusion that the case must be remanded to the commission for further proceedings due to a substantive defect in the decision adopted by the commission, we need not address the plaintiff's contention that the commission failed to exercise its judgment by adopting the hearing officer's decision. We consider it both speculative and doubtful that the concern raised is likely to arise on remand. Cf. *MSO, LLC* v. *DeSimone*, 313 Conn. 54, 66, 94 A.3d 1189 (2014) (clarifying standard likely to arise on remand).

[7] See 1 P. Rice, Attorney-Client Privilege in the United States (2d Ed. Rev. 2010) § 7:6, p. 7-78 ("there is general agreement that the protection of the privilege applies only if the *primary or predominate purpose* of the attorney-client consultation is to seek legal advice or assistance" [emphasis in original]); 24 C. Wright & K. Graham, Federal Practice and Procedure (1986) § 5490, p. 444 (majority rule is " 'dominant purpose' doctrine"); see, e.g., *Alomari* v. *Ohio Dept. of Public Safety*, 626 Fed. Appx. 558, 570 (6th Cir. 2015), cert. denied,      U.S.     , 136 S. Ct. 1228, 194 L. Ed. 2d 185 (2016); *Exxon Mobil Corp.* v. *Hill*, 751 F.3d 379, 382 (5th Cir. 2014); *In re Diagnostics Systems Corp.*, 328 Fed. Appx. 621, 622–23 (Fed. Cir. 2008); *In re County of Erie*, supra, 473 F.3d 422–23; *In re Buspirone Antitrust Litigation*, 211 F.R.D. 249, 252–53 (S.D.N.Y. 2002); *Cuno, Inc.* v. *Pall Corp.*, 121 F.R.D. 198, 204 (E.D.N.Y. 1988); *Barr Marine Products Co.* v. *Borg-Warner Corp.*, supra, 84 F.R.D. 634–35; *Zenith Radio Corp.* v. *Radio Corp. of America*, supra, 121 F. Supp. 794–95. But see *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758–60 (D.C. Cir. 2014) (in context of internal investigation, declining to apply single primary purpose and instead concluding that test is "whether obtaining or providing legal advice was *one* of the significant purposes of the attorney-client communication" [emphasis added]).

[8] We note that the level of generality in the commission's decision would have failed to provide a meaningful and workable framework to evaluate the hundreds of communications at issue, spanning a four and one-half year period, had we needed to undertake an in camera review to decide whether the commission's findings and conclusions were proper. The commission's decision makes the conclusory assertion that each of the communications "relate[s] to legal advice sought by the [defendant]" and broadly character-izes an unspecified subset of those communications as containing "a mix of legal and business advice." We contrast this approach with those applied in other cases, such as where the fact finder has, by reference to specific document numbers, distinguished communications that expressly seek legal advice from those that do not, and, after scrutinizing the latter category, distinguishing those that implicitly seek legal advice from those that do not. See, e.g., *Valente* v. *Lincoln National Corp.*, supra, 2010 WL 3522495, *3–4; see also *A & R Body Specialty & Collision Works, Inc.* v. *Progressive Casualty Ins. Co.*, Docket No. 3:07CV929 (WWE), 2013 WL 6044342, *3–6 (D. Conn. November 14, 2013) (addressing communications by topic); *Robinson* v. *Texas Automobile Dealers Assn.*, 214 F.R.D. 432, 445–57 (E.D. Tex. 2003) (individually addressing communications), vacated in part on other grounds sub nom. *In re Texas Automobile Dealers Assn.*, Docket No. 03-40860, 2003 WL 21911333 (5th Cir. July 25, 2003). We appreciate that the hearing officer had an exceedingly difficult task to perform in the present case, given the volume of the communications, the often cryptic content of the e-mails, Hunt's inability to provide detailed explanations of the communications without revealing the matters that the defendant claimed to be privileged, and the difficulties inherent in distinguishing between business advice and legal advice. Nonetheless, a decision on these matters should establish a record that is amenable to review.