# STATE OF CONNECTICUT *v.* LINDA KOSUDA-BIGAZZI
## (SC 20341)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The defendant, who had been charged with murder and tampering with
physical evidence, filed a motion in the trial court to dismiss the charges
against her on the ground that the police prejudiced her prosecution
when they executed search warrants for her home and seized and examined privileged information that was thereafter published in their arrest
warrant application. The police had gone to the home that the defendant
shared with H, the defendant's husband, to perform a wellness check
after H's employer reported that he had not been seen in several months.
After observing human remains in the home, the police executed two
search warrants. During the second search, the police seized three separate files from a filing cabinet. The first file, labeled "INCIDENT 2017,"
contained about twenty-five pages, most of which were handwritten.
The second file, labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017,"
contained about 150 pages. The third file contained estate planning
documents. The police then obtained an arrest warrant for the defendant's alleged murder of H. The arrest warrant application included the
verbatim text of a handwritten, four page narrative from the seized
material that apparently described the events that led to H's death. The
defendant alleged that, during the search of her home, the police read
and inspected two documents that were protected by the attorney-client
privilege, namely, the four page narrative and a document that reflected
her trial strategy, both of which, she claimed, the state could use in
preparation of its case against her in violation of her constitutional
rights to a fair trial and the effective assistance of counsel. The trial
court conducted an evidentiary hearing pursuant to *State* v. *Lenarz* (301
Conn. 417) to determine the extent of the violation of the attorney-client
privilege and the prejudice to the defendant, and whether the state's
remedial actions and other remedies could serve to cure any prejudice.
During the hearing, the court accepted the parties' written stipulation
that the contents of the second file were covered by the attorney-client
privilege. The court also heard the testimony of witnesses from the
state's attorney's office, who stated that they had acted to limit additional
exposure to potentially privileged materials by halting the investigation
until after the resolution of the *Lenarz* hearing and by having the case

State *v.* Kosuda-Bigazzi

handled by a different state's attorney's office. The court denied the
defendant's motion to dismiss, concluding that the defendant failed to
establish that the contents of the first file were protected by the attorney-
client privilege or that much of the contents of the third file were
protected by that privilege. The court further determined that the preju-
dice to the defendant that was caused by the invasion of the attorney-
client privilege could be cured by a remedy short of dismissal of the
charges. The court also ordered the state to take certain remedial actions
to limit further prejudice to the defendant before prosecution could
resume. Following the court's denial of the defendant's motion to dis-
miss, the defendant appealed to this court pursuant to the statute (§ 52-
265a) permitting the Chief Justice to certify an appeal involving a matter
of substantial public interest and in which a delay may work a substantial
injustice. *Held*:

1. The defendant could not prevail on her claim that the trial court committed
   clear error in determining that she had failed to establish that the docu-
   ments in the first file and many of the documents in the third file were
   protected by the attorney-client privilege:

   a. The trial court did not abuse its discretion in precluding one of the
   defendant's expert witnesses, D, from testifying regarding the substance
   of certain out-of-court statements that the defendant made to D regarding
   the fact that she had created the documents in the first file for the
   purpose of seeking legal advice, as those statements constituted inadmis-
   sible hearsay and were properly admitted only as a basis for D's expert
   opinion, and the record contained no other evidence that would serve
   to establish the defendant's intent when she created those documents;
   moreover, the trial court did not abuse its discretion in precluding the
   testimony of two other expert witnesses, W and S, as W and S had no
   knowledge relating to the defendant's intent in creating the documents
   in the first file and, thus, could not have provided any information that
   would have assisted the court as the trier of fact, and W's and S's
   testimony would have been cumulative of D's testimony and centered
   on the ultimate issue of whether the defendant established that those
   documents were privileged, which was a determination for the trial
   court alone to make.

   b. The defendant could not prevail on her claim that the manner in
   which she maintained the documents in the first file established that
   they were privileged; the location of the privileged second file next to
   the first file in the filing cabinet did not serve to transfer the attorney-
   client privilege from one file to another, and the defendant's proximity
   claim was contrary to the well established principle that the attorney-
   client privilege must be established for each document separately.

   c. The defendant could not prevail on her claim that the documents in
   the first file were sufficient in and of themselves to be considered
   privileged on the ground that their content was obviously useful to
   preparing her defense: the defendant failed to establish whether the
   handwritten documents in the first file describing her medical issues

State *v.* Kosuda-Bigazzi

and the incident that led to H's death were created for the purpose of seeking legal advice or for some other personal purpose, as the documents did not reflect notes describing actual communications or memorializations of communications between the defendant and her attorney, and the defendant did not adduce any additional evidence to establish that she had created those documents for the purpose of seeking legal advice or that she had communicated or intended to communicate those documents to her attorney; moreover, the printouts of the defendant's medical records in the first file were preexisting documents that were outside the scope of the attorney-client privilege, as they predated the incident that gave rise to the attorney-client relationship at issue by approximately nine years, and the defendant did not introduce evidence to establish that those printouts were created for the purpose of seeking legal advice.

d. Although the documents contained in the first file were substantively identical to the documents in the privileged second file, the documents in those two files were not the same and, thus, the first file was not privileged: both files contained documents containing the narrative describing the incident that led to H's death, but they were not exact copies, and there were many versions of the narrative that were told in substantively different ways and were of different lengths and detail; moreover, nothing in the first file suggested that the documents contained therein were communications between the defendant and her attorney or that they were created at the behest of an attorney for the purpose of seeking legal advice; furthermore, the first file contained a variety of documents, some of which appeared like journal entries, others that were in a narrative style that described traumatic events, and others that were preexisting documents, and the record did not support the defendant's claim that the state's stipulation that the second file was privileged should transfer to the first file.

e. The defendant could not prevail on her claim that the estate planning documents in the third file should be covered by the attorney-client privilege as communications made to an attorney for the purposes of drafting a will: that file contained an executed will rather than a draft of a will that would be considered a communication in the context of a will dispute; moreover, other records and documents in the third file were insufficient to support the defendant's assertion that those records and documents were communications inextricably linked to the giving of legal advice, and the records and documents therein did not contain anything suggestive of the defendant's trial strategy.

2. The trial court did not abuse its discretion in determining that dismissal of the charges against the defendant was not warranted and that the state met its burden of showing, by clear and convincing evidence, that the remedial steps it took could cure any presumed prejudice and prevent future prejudice to the defendant: the court credited the testimony of witnesses at the *Lenarz* hearing that the police officers' exposure to privileged materials was not intentional, and the state, once it was

State *v.* Kosuda-Bigazzi

alerted to the privileged nature of the documents, halted its investigation of the defendant, created a taint team to remove privileged documents before they could reach new prosecutors, removed the case from the original investigative body, and assigned new prosecutors; moreover, the defendant's state constitutional (article first, § 19) right to individual voir dire could serve to mitigate any prejudice by exposing whether prospective jurors had been exposed to privileged materials and by uncovering potential biases; furthermore, the trial court's preclusion of testimony by the defendant's expert witness about media exposure of the privileged materials did not prevent the defendant from demonstrating the extent of the prejudice she suffered, as that expert's testimony was not relevant or sufficiently reliable and would not have assisted the court in determining whether any prejudice could be remedied.

(*One justice concurring separately*)

Argued October 15, 2019—officially released April 8, 2020*

*Procedural History*

Information charging the defendant with the crimes of murder and tampering with physical evidence, brought to the Superior Court in the judicial district of New Britain, where the court, *Oliver, J.*, denied the defendant's motion to dismiss, and the defendant, upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest is involved, appealed to this court. *Affirmed.*

*Patrick Tomasiewicz*, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom were *Sarah Hanna*, assistant state's attorney, and, on the brief, *Christian M. Watson*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The principal issue in this interlocutory public interest appeal, brought pursuant to General

* April 8, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Kosuda-Bigazzi

Statutes § 52-265a,[1] is whether police officers executing a search and seizure warrant for the home of the defendant, Linda Kosuda-Bigazzi, invaded her attorney-client privilege to the extent that the charges of murder in violation of General Statutes § 53a-54a and tampering with physical evidence in violation of General Statutes § 53a-155 brought against her should be dismissed pursuant to *State* v. *Lenarz*, 301 Conn. 417, 22 A.3d 536 (2011), cert. denied, 565 U.S. 1156, 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012). The defendant claims that the trial court improperly denied her motion to dismiss the charges because the police prejudiced all further prosecution against her by examining, reading, and publishing privileged information that was in the arrest warrant application, a prejudice so extreme that the only appropriate remedy is dismissal of the criminal charges, as we ordered in *Lenarz*.

The documents the defendant claims are privileged had been located within three files—exhibits A, B, and C—in a locked file cabinet in an office in the defendant's home. The parties stipulated that the privilege covered all of the contents of exhibit B, a file labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017."[2] The defendant asserts that the privilege also covered the two other seized files: one labeled "INCIDENT 2017" (exhibit A), and one containing estate planning documents (exhibit C). She contends that the documents located within exhibit A are privileged because they are substantively identical to some of the documents located within and next to exhibit B. She contends that exhibit C is privileged because it contains documents communicated to her

[1] General Statutes § 52-265a (a) provides in relevant part: "[A]ny party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court . . . ."

[2] We describe some of the documents contained within exhibit B only generally to protect the defendant's attorney-client privilege.

State *v.* Kosuda-Bigazzi

attorney for estate planning purposes. Ultimately, she argues that the invasion of her attorney-client privilege during the search of her home will prejudice her prosecution to such an extent that the only just remedy is dismissal of the charges against her in connection with the death of the decedent. She therefore moved to dismiss the criminal information, which the trial court denied after conducting a twelve day hearing pursuant to *Lenarz* (*Lenarz* hearing). For the reasons that follow, we affirm the trial court's order and denial of the defendant's motion to dismiss.

We agree with the trial court that the defendant failed to establish that the documents within exhibits A and C are protected by the attorney-client privilege for purposes of the *Lenarz* hearing. The defendant did not establish that the documents are communications or that she created the documents with the intent to communicate them to an attorney for the purpose of seeking legal advice. Regarding exhibit B, the record supports the trial court's unchallenged ruling that the privilege covers certain documents contained within that file.[3] We therefore conclude that the trial court did not abuse its discretion in determining that the defendant was prejudiced by the examination and seizure of the privileged documents within exhibit B. However, we conclude that the trial court properly determined that the state demonstrated, by clear and convincing evidence, that the remedial actions the state has taken, and the order that the trial court entered for further prosecution of the case, as well as individual jury voir dire, can cure the prejudice to the defendant. The state's actions in the present case therefore do not rise to the level of the extreme prejudice demonstrated in *Lenarz*, and dismissal of the criminal information is not warranted. We

[3] Pursuant to the trial court's order, exhibit B remains under seal in the trial court clerk's office, subject to review only upon prior authorization by a judge of the Superior Court.

State *v.* Kosuda-Bigazzi

affirm the order of the trial court and the denial of the motion to dismiss.

I

The following facts, as found by the trial court, and procedural history are relevant to our review of the defendant's claims. On February 5, 2018, Officer Kevin Mellon of the Burlington Police Department went to the residence shared by the defendant and the decedent to perform a wellness check on the decedent.[4] The decedent's employer had not seen or heard from him since August, 2017. Before Mellon entered the residence, the state police barracks in Litchfield received a phone call from Attorney Brian S. Karpe, who stated that the defendant was inside the residence and that the police should not enter until Karpe arrived at the home. Upon his arrival, Karpe entered the residence "for a period of time" and then "allowed the police inside to conduct a limited search to check on [the decedent]." In the basement of the residence, Mellon observed human remains covered by a tarp. The Office of the Chief Medical Examiner positively identified the remains as those of the decedent.

That same evening, at about 11 p.m., Detective Michael W. Fitzsimons, who was assigned to the state police Western District Major Crime Squad, obtained a search and seizure warrant for the residence "for potential evidence relating to a crime involving the human remains found in the basement." The following day, a second search warrant issued, authorizing the police to search for evidence relating to the crime of murder.

During the second search of the residence, the police cut the locks on the file cabinet from which they seized the three separate files. Those files became (1) defense exhibit A—a file labeled "INCIDENT 2017," containing

_____

[4] In accordance with our policy of protecting the privacy interest of the victims of family violence, we decline to identify the decedent. See General Statutes § 54-86e.

State *v.* Kosuda-Bigazzi

about twenty-five pages of mostly handwritten pages, (2) defense exhibit B—a blue accordion file folder labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017," containing about 150 pages, and (3) defense exhibit C—a file containing estate planning documents. The day after the execution of the second search warrant, the police obtained an arrest warrant charging the defendant with murder and tampering with physical evidence. At the time the arrest warrant was issued, the trial court granted the state's request to seal for fourteen days after the defendant's arrest the police affidavit that was submitted in support of the arrest warrant application. The arrest warrant application included the verbatim text of a handwritten, four page "narrative," apparently describing the events leading to the death of the decedent.[5]

In moving to dismiss the criminal charges, the defendant alleged that the police had read and inspected two documents protected by the attorney-client privilege— the narrative and a document reflecting her trial strategy.[6] According to the defendant, the state could use the

---

[5] Two narratives are located within exhibit A, and one narrative is located within exhibit B. The substance and text of the narratives themselves are copies in that they are handwritten and exactly identical. Because the defendant did not establish which is the original version of the narrative and which are copies, we refer to them all as "copies." Each copy, however, is marked differently. During the *Lenarz* hearing, State Police Detective Edmund Vayan testified, and defense counsel acknowledged, that the documents are not identical. Copy #1 (exhibit A) has the defendant's first and last name in handwriting across the top of page one. No other copy has that marking. Copies #1 and #2 (exhibit A) have a thin blackout mark at the top of page one. Copy #3 (exhibit B) has a much thicker blackout mark at the top of page one. Copies #1 and #2 have the year 2017 handwritten and circled in the top right corner of the first page, just above the handwritten initials of the defendant. On Copy #3 (exhibit B), the year 2017 is handwritten directly above the defendant's initials, but is not circled, in the top right corner of the first page. The bottom right corner also contains the handwritten initials of the defendant. State Police Detective Corey Clabby testified that the arrest warrant application quoted from the copy contained within exhibit A, not exhibit B.

[6] Although both exhibit A and exhibit B contain the "narrative," only exhibit B contains trial strategy documents.

State *v.* Kosuda-Bigazzi

information in these documents "in plea negotiations, witness preparation, jury selection, and case presentation, including cross-examination and closing argument, as well as in drafting suggested jury instructions." She further argued: "Despite the best intentions and efforts of the state's attorney's office, it will be humanly impossible not to consider the privileged information during plea negotiations, case preparation and the trial of the matter." According to the defendant, the actions of the police will deprive her of her right to a fair trial and her sixth amendment right to effective counsel.[7] The trial court conducted the *Lenarz* hearing to explore the extent of the invasion of the attorney-client privilege, the prejudice to the defendant, and whether the state's remedial actions and any additional remedies could serve to cure the prejudice, thereby protecting the defendant's rights to the assistance of counsel and a fair trial.

The *Lenarz* hearing included testimony from numerous law enforcement witnesses, including the state's attorney for the New Britain judicial district, Brian Preleski, and an expert witness for the defendant, Attorney Mark Dubois. Dubois, who was qualified by the court as an expert in the field of attorney-client privilege, reviewed the contents of defense exhibits A, B, and C and offered his opinion as to whether the privilege covered each document. State's Attorney Preleski testified as to the remedies the state implemented to cure any prejudice to the defendant as well as recommended procedures for the future prosecution of the defendant. The remedies included having the case handled by the Hartford judicial district and a different state police

---

[7] The defendant also claimed that the invasion of her attorney-client privilege impacted her fifth amendment right against self-incrimination under the United States constitution, arguing that she "is now faced with the heavy burden of having to waive her privilege of not having to testify and may be forced to testify to explain" the case that the state will mount against her. The defendant does not pursue this claim in this appeal.

State *v.* Kosuda-Bigazzi

investigative unit, and having the New Britain State's Attorney's Office act as an insulated "taint" team to review, remove, and redact privileged documents, motions, and transcripts before they could reach the Hartford judicial district.

Having heard the evidence and considered the parties' positions, the trial court found as follows: Regarding the documents contained within defense exhibit A, the trial court found that the defendant had failed to establish that those documents describing the incident in question were privileged, specifically because she failed to establish that she had created the documents with the intent to provide them to counsel for the purpose of obtaining legal advice. The court found that the defendant failed to establish that the documents describing her medical condition were privileged because she had made only vague and generalized assertions about them that were insufficient to satisfy the narrowly construed attorney-client privilege. The court also found that, to the extent information in certain documents could have been construed as trial strategy, it was "not sufficiently specific to a defense so as to be prejudicial to the defendant" and that the defendant had failed to show that she had the intent to establish the attorney-client relationship. The trial court found that certain other documents within exhibit A contained eleven year old information, were preexisting, and not privileged. Finally, regarding the documents describing the "tumultuous relationship between the defendant and the decedent," the trial court found that the defendant had not produced sufficient evidence at the *Lenarz* hearing "to establish either that the document[s] [were] created at the request of any attorney or with the intent to be provided to any attorney for the purpose of obtaining legal advice."

Regarding defense exhibit C, the trial court found that both draft and executed estate planning documents were not privileged because they were either "docu-

State *v.* Kosuda-Bigazzi

ments of the sort meant to be made public and provided
to third parties as a matter of course'' or nonprivileged,
preexisting documents. The court found that the defen-
dant had failed to carry her burden of establishing that
invoices, household bills, and other paperwork con-
tained within exhibit C were privileged because she had
''failed to show the nexus between the exhibits and the
culmination of the legal advice: the executed estate plan-
ning files.'' The court also found that the defendant had
failed to sustain her burden of establishing that copies
of a document apparently authored by the decedent
were privileged because she failed to adduce sufficient
evidence to establish that the attorney-client privilege
was applicable to them. Regarding documents containing
biographical information about the decedent and docu-
mentation related to his previous marriage, the trial
court found that the defendant had failed to show that
she would be the proper party to be able to invoke the
attorney-client privilege. Finally, as to any privileged
documents within exhibit C, the trial court found that
''the defendant has failed to assert or establish that the
privileged documents contain evidence of the defen-
dant's trial strategy or position. Accordingly, this court
finds that the defendant suffered no injury for law
enforcement's invasion of the privilege as to exhibit C,
ending the court's inquiry as to this exhibit.''

The court accepted a written stipulation from the
parties that the attorney-client privilege covered the
entire contents of exhibit B.[8] On the basis of the stipula-
tion, the evidence presented at the *Lenarz* hearing, and
its own review of the documents within exhibit B, the
trial court found that the defendant had ''met her burden
of proof in establishing that law enforcement officials

[8] Exhibit B contains a plethora of documents—about 150 pages—some
of which are also included in exhibit A. Both exhibit A and exhibit B contain
the ''narrative'' document. See footnote 5 of this opinion. Exhibit B also
includes multiple trial strategy documents that were not included in
exhibit A.

seized from her home communications protected by the attorney-client privilege.'' The state conceded, and the court accepted, that ''certain of the privileged communications [could] be construed to reflect a potential trial strategy and/or the defendant's position as a then potential criminal defendant.'' Given that invasion of the privilege and the nature of the documents, the defendant argued that the presumption of prejudice announced in *Lenarz* was applicable. See *State* v. *Lenarz*, supra, 301 Conn. 437 (''because the disclosure of [attorney-client communications containing information concerning the defendant's trial strategy] is inherently prejudicial, prejudice should be presumed'' (emphasis omitted)). The state did not seek to rebut that presumption as to exhibit B but, rather, sought to establish that the prejudice could be cured by a remedy short of dismissal of the charges against the defendant.

Specifically regarding prejudice to the defendant, the trial court, on the basis of the testimony throughout the *Lenarz* hearing, found that the police officers' initial invasion of the attorney-client privilege was unintentional. The state presented the testimony of Preleski to describe the prosecution's efforts to minimize future prejudice. Preleski was not present at the search of the defendant's home. He was contacted by the prosecuting attorney, then Assistant State's Attorney Christian M. Watson, to review the seized documents and to determine if they were privileged, as well as to consider potential future procedures for the defendant's prosecution. Preleski testified that the New Britain State's Attorney's Office acted to ''limit additional exposure to potentially privileged materials with an eye toward future 'taint-free' investigations and prosecution of this matter.'' The state's actions included treating the New Britain State's Attorney's Office as a ''taint team,'' halting the investigation of the matter until after the resolution of the *Lenarz* issue, and having the case handled by another state's attorney's

office that had no knowledge of the privileged communications.

In accordance with the state's remedial actions and recommendations, and to limit any further prejudice to the defendant, the trial court ordered that (1) the case was to be transferred out of the New Britain judicial district, (2) and no longer prosecuted by the New Britain state's attorney, (3) or investigated by the state police Western District Major Crime Squad, (4) the trial was not to be held in the New Britain judicial district but that the case was to be transferred to a judicial district to be determined by the chief administrative judge for criminal matters, along with the chief state's attorney, to be litigated by prosecutors without knowledge of the privileged communications and investigated by a state law enforcement agency without knowledge of the privileged communications, (5) privileged documents would remain exhibits under seal in the courthouse clerk's office, subject to review only upon prior authorization by a judge of the Superior Court after submission of a properly certified written motion, (6) motions and other filings from the *Lenarz* hearing on the motion to dismiss, if filed under seal, would remain under seal and be maintained by the clerk of the court with disclosure permitted only upon authorization by a judge of the Superior Court, (7) the courthouse clerk's file from the *Lenarz* hearing was not to be disclosed or subject to review by the subsequent prosecuting authority or investigative agency, and requests for copies would be subject to redaction by the court, (8) audio recordings of the *Lenarz* hearing were not to be reviewed by the incoming prosecutors or investigators, (9) the transcripts of closed court sessions were not to be available to the successor prosecuting authority or investigating agency, (10) the New Britain State's Attorney's Office would act as an aid to the court and an additional buffer, having already been exposed to the privileged materials, (11) transcripts sought by future

State *v.* Kosuda-Bigazzi

prosecutors and investigators would be reviewed and filtered through the New Britain State's Attorney's Office and a judge of the Superior Court, subject to redaction, and (12) state police troopers from Troop L in Litchfield with knowledge of the contents were not to be permitted to discuss the substance of the materials with any other law enforcement agency or prosecutor's office.

In light of these ordered remedies, the trial court denied the defendant's motion to dismiss on the basis of three determinations: (1) the defendant had failed to establish that exhibit A was protected by the attorney-client privilege, (2) the defendant had failed to establish that exhibit C was, by and large, protected by the privilege, and (3) the prejudice to the defendant caused by the invasion of the privilege could be cured by a remedy short of dismissal of the criminal information. The defendant filed a petition for certification to appeal to this court pursuant to § 52-265a (a). Because the application raised a "matter of substantial public interest . . . in which delay may work a substantial injustice," the Chief Justice granted the application. See General Statutes § 52-265a (a).

The trial court did not clearly err when it found that the defendant failed to establish that the documents within exhibit A and in much of exhibit C are protected by the attorney-client privilege. Specifically, the defendant did not meet her burden of establishing that the documents reflect privileged communications between herself and her attorney, or that she created the documents with the intent to communicate them to an attorney for the purpose of seeking legal advice, or that she transformed preexisting documents in such a manner as to render them privileged. In this appeal, we do not review the documents within exhibit B to determine whether the defendant met her burden of establishing that they were privileged because the state does not challenge the trial court's finding that exhibit B contains

State *v.* Kosuda-Bigazzi

privileged documents or the trial court's acceptance of the parties' written stipulation that the contents of exhibit B are privileged. See footnote 8 of this opinion and accompanying text. Furthermore, the state does not challenge the trial court's finding that the investigating officers prejudiced the defendant by reading documents within exhibit B that reflected ''potential trial strategy and/or the defendant's position as a then potential criminal defendant.'' Rather, the state asserts in its brief to this court that any prejudice to the defendant ''has already been, and will continue to be, cured by [the] state's [previous] prompt actions [to minimize future prejudice to the defendant] and the remedy fashioned by the trial court.'' Therefore, according to the state, dismissal of the charges against the defendant is not required. The trial court did not abuse its discretion in finding that the state demonstrated, by clear and convincing evidence, that the state's remedial actions can cure any prejudice to the defendant. The state's actions in the present case therefore do not rise to the level of the extreme prejudice demonstrated in *Lenarz*, and dismissal of the criminal information is not warranted.

II

To address the defendant's claims, we must first evaluate whether the trial court correctly determined that the defendant did not meet her burden of establishing that the attorney-client privilege protects the documents contained within exhibits A and C that the police seized. We review the trial court's determination that the defendant did not meet her burden under the clear error standard. See, e.g., *State* v. *Lenarz*, supra, 301 Conn. 424 (applying clearly erroneous standard of review to trial court's findings).

''Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confi-

State *v.* Kosuda-Bigazzi

dence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived.'' (Internal quotation marks omitted.) *Rienzo* v. *Santangelo*, 160 Conn. 391, 395, 279 A.2d 565 (1971), quoting 8 J. Wigmore, Evidence (McNaughton Rev. 1961) § 2292, p. 554; see also *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 159, 757 A.2d 14 (2000) (evaluating whether communications between defendant's attorney and entity she hired to prepare report were inextricably linked to rendering of legal advice). ''In Connecticut, the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice. . . . The privilege fosters full and frank communications between attorneys and their clients and thereby promote[s] the broader public interests in the observation of law and [the] administration of justice.'' (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 329–30, 838 A.2d 135 (2004). The privilege applies, however, only when necessary to achieve its purpose; it is not a blanket privilege. See *Harrington* v. *Freedom of Information Commission*, 323 Conn. 1, 12, 144 A.3d 405 (2016).

The attorney-client privilege applies to oral and written communications. See, e.g., E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 5.16.1 (b), p. 262 (''[c]ommunications between an attorney and a client can be written as well as oral''); see also 1 Restatement (Third), The Law Governing Lawyers § 69, comment (b), p. 525 (2000) (''A communication can be in any form. Most confidential client communications to a lawyer are written or spoken words . . . .''). The present case involves documents, and our analysis will focus on that form of communication. The privilege must be established for ''each document separately con-

State *v.* Kosuda-Bigazzi

sidered'' and must be narrowly applied and strictly construed. (Internal quotation marks omitted.) *Harrington* v. *Freedom of Information Commission*, supra, 323 Conn. 12. "The burden of establishing the applicability of the privilege rests with the party invoking it''; id.; see also *State* v. *Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963) ("[t]he burden of proving the facts essential to the privilege is on the person asserting it''); and the burden applies in both civil and criminal contexts.

First, a party can establish that a document is privileged by showing that the document is itself the record or memorialization of a communication between the client and the attorney. See 1 Restatement (Third), supra, § 69, p. 525 ("[a] communication . . . is any expression through which a privileged person . . . undertakes to convey information to another privileged person and any document or other record revealing such an expression''); see also *United States* v. *DeFonte*, 441 F.3d 92, 95 (2d Cir. 2006) (memorializations of private conversations between client and attorney protected from disclosure by attorney-client privilege). If the document is not a record of a communication, a party can still establish privilege by showing that (1) the document was created with the intent to communicate the contents to an attorney, and (2) the client actually communicated the contents to the attorney. See id., 96 ("A rule that recognizes a privilege for any writing made with an eye toward legal representation would be too broad. A rule that allows no privilege at all for such records would discourage clients from taking the reasonable step of preparing an outline to assist in a conversation with their attorney.''). Perhaps the most obvious example is a client's outline or notes made in preparation for a meeting with an attorney, or at the attorney's behest to facilitate communication between attorney and client, and then the client and the attorney actually communicate about the contents of the notes. See, e.g., *United States ex rel. Locey* v.

State *v.* Kosuda-Bigazzi

*Drew Medical, Inc.*, Docket No. 6:06-cv-564-Orl-35KRS, 2009 WL 88481, *2–3 (M.D. Fla. January 12, 2009) (chronology "prepared at the direction of counsel to communicate information to counsel for the purposes of seeking legal advice . . . is protected by the attorney-client privilege"); *Bernbach* v. *Timex Corp.*, 174 F.R.D. 9, 10 (D. Conn. 1997) (client's notes contained in her notebooks were privileged because notes were made for purpose of seeking legal advice and were communicated to attorney in confidence).

In the context of creating documents for the purpose of seeking legal advice, one final wrinkle arises when a party asserting the attorney-client privilege creates a document with the intent to communicate the contents to an attorney but, on the basis of the circumstances, the actual communication does not take place. If, for example, a party asserting the privilege could establish creation of a document for the purpose of seeking legal advice but that the police seized the document prior to the actual communication to the attorney, the document may maintain its privileged status. See *State* v. *Lenarz*, supra, 301 Conn. 441 n.18 ("[i]f a person creates a document with the intent to communicate it to an attorney for the purpose of facilitating the attorney's representation of that person, it would be entirely inconsistent with the purpose of the attorney-client privilege to allow third parties to obtain access to the document up to the time that the person actually communicates it to the attorney").

Last, although more tenuous, there is some support for the proposition that a party could establish the attorney-client privilege by showing transformation of a preexisting document into a communication for the purpose of seeking legal advice and that the document was communicated to or intended to be communicated to an attorney. Preexisting documents are documents that are *not* a record of a communication and were *not* created for the purpose of seeking legal advice. See 1 R.

State *v.* Kosuda-Bigazzi

Mosteller et al., McCormick on Evidence (8th Ed. 2020) § 89, p. 632 ("A professional communication in writing, as a letter from client to lawyer for example, will of course be privileged. These written privileged communications are readily to be distinguished from preexisting documents or writings, such as deeds, wills, and warehouse receipts, not in themselves constituting communications between client and lawyer." (Footnote omitted.)). "[Preexisting] documents that are not in themselves communications . . . are treated in different ways, depending on how the attorney acquired them." E. Prescott, supra, § 5.16.1 (c), p. 262. A preexisting document does not become privileged merely because it is "transferred to or routed through an attorney." *Resolution Trust Corp.* v. *Diamond*, 773 F. Supp. 597, 600 (S.D.N.Y. 1991); see also 1 Restatement (Third), supra, § 69, comment (j), p. 530 ("[a client authored] document that is not a privileged document when originally composed does not become privileged simply because the client has placed it in the lawyer's hands"). However, a preexisting document could become privileged if it were somehow transformed for the purpose of seeking legal advice and communicated or intended to be communicated to an attorney. See *Angst* v. *Mack Trucks, Inc.*, Docket Nos. 90-3274, 90-4329, 1991 WL 86931, *2 (E.D. Pa. May 14, 1991) (reasoning that plaintiff's handwritten notes made for personal use, not for purpose of securing attorney, would not fall within privilege, but typed compilation and summary created for purpose of securing counsel would fall within privilege). The oft stated shorthand rule for preexisting documents provides: "If the client would have to produce [the document], were the client in possession of [it], then the attorney must produce it; if the client would not have to produce, the attorney would not have to produce." E. Prescott, supra, § 5.16.1 (c), p. 262, citing *Fisher* v. *United States*, 425 U.S. 391, 403–404, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976).

With these principles in mind, we examine the record to evaluate whether the trial court clearly erred in deter-

State *v.* Kosuda-Bigazzi

mining that the defendant had failed to establish that the documents within exhibits A and C constitute communications, or that she had failed to establish that she created the documents for the purpose of seeking legal advice and actually communicated the contents or intended to communicate the contents to her attorney, or that she failed to establish that she transformed preexisting documents into nondiscoverable, privileged communications.

A

The defendant first asserts that the trial court clearly erred when it found that exhibit A was not privileged. Specifically, she argues that the court erroneously determined that she had not met her burden of establishing that she created the documents with the intent to communicate them to her attorney for the purpose of seeking legal advice. The defendant contends that she met her burden of establishing that the documents warrant the protection of the attorney-client privilege on the basis of (1) expert testimony, (2) the fact that the documents within exhibit A were located in her file cabinet directly next to exhibit B, labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017," and (3) the fact that exhibit A contained written statements substantively identical to the documents within exhibit B. Finally she asserts that the documents must be privileged on the basis of the fact that the state stipulated to the privilege covering exhibit B. We disagree. The trial court record the defendant developed regarding the factual circumstances surrounding the creation of the documents within exhibit A is sparse, at best, and does not support her argument that the trial court clearly erred in determining that she did not establish that she created the documents within exhibit A for the purpose of seeking legal advice.

1

First, the defendant attempts to rely on the trial court's limitation of Dubois' testimony as well as the

State *v.* Kosuda-Bigazzi

trial court's preclusion of two additional experts in support of her position that she established that she had created the documents within exhibit A for the purpose of seeking legal advice. We review the trial court's ruling on evidentiary matters, as well as its determination concerning the admissibility of testimony from expert witnesses, for abuse of discretion. See, e.g., *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005); see also *State* v. *Williams*, 317 Conn. 691, 701–702, 119 A.3d 1194 (2015) (affording trial courts "wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision" (internal quotation marks omitted)).

In her brief, the defendant states that she "advised Dubois that the documents in both exhibits A and B had been created, accumulated and organized prior to her . . . visits with . . . attorneys, and that the file was prepared to organize her thoughts and communicate to her lawyers what she had been dealing with and what happened regarding the untimely death of the [decedent], for the purpose of seeking legal advice." Indeed, Dubois testified that he met with the defendant and, on the basis of that meeting, concluded that all of the documents within exhibit A were privileged. However, the trial court did not admit Dubois' testimony about the defendant's intent when *creating* the documents for the truth of the matter because the statements constituted inadmissible hearsay. In fact, the trial court explicitly did not permit Dubois to opine as to the defendant's intent in creating the documents. The court stated: "[H]e's not allowed to opine, it's my opinion that she intended to create a privilege—the court will not allow that." Defense counsel asked if he could make an offer of proof, and the court responded: "No. An offer of proof as to his opinion as to her intent to create the privilege, no. You can lay out the facts, you can lay out his review,

State *v.* Kosuda-Bigazzi

you can lay out his conversation, but not as to the intent; that's up to this court.''

The trial court did not abuse its discretion in permitting Dubois' testimony relating to the defendant's hearsay statements to him under § 7-4 (b) of the Connecticut Code of Evidence[9] as the basis for his expert opinion and for no other substantive purpose. See *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 726, 80 A.3d 887 (2013) (''[I]nadmissible facts upon which experts customarily rely in forming opinions can be derived from sources such as conversations . . . . [However, § 7-4 (b)] expressly forbids the facts upon which the expert based his or her opinion to be admitted for their truth unless otherwise substantively admissible under other provisions of the [c]ode.'' (Emphasis omitted; internal quotation marks omitted.)). Section 7-4 (b) ''does not constitute an exception to the hearsay rule or any other exclusionary provision of the [c]ode.'' (Internal quotation marks omitted.) Id. Any statements the defendant made to Dubois about her intent in creating the documents were made out of court, did not fall within any hearsay exception, and were properly admitted only as a basis for Dubois' expert opinion, not for the truth of whether the defendant created the documents for the purpose of seeking legal advice.

The record contains no other evidence that would help establish the defendant's intent at the time she created the documents or her intent to communicate the documents to obtain legal advice.[10] The defendant

[9] Section 7-4 (b) of the Connecticut Code of Evidence provides in relevant part: ''The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. . . . The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence.''

[10] In *Lenarz*, the defendant testified in an ex parte hearing before the trial court that he prepared the documents in order to obtain advice from counsel and then communicated those documents to counsel. See *State* v. *Lenarz*, supra, 301 Conn. 423; id., 457–58 (*Palmer, J.*, dissenting). The trial court credited that testimony and found that the documents were privileged

State *v.* Kosuda-Bigazzi

herself did not testify at any point during the *Lenarz*
hearing. She did not attest to when, or for what purpose,
she created the documents or that she in fact communi-
cated the documents to her attorney for the primary
purpose of seeking legal advice. Nor did she or anyone
else explain the relationship between the documents
within exhibit A and any corresponding versions con-
tained within exhibit B, which (if any) is an original,
which is a copy, the reason(s) for creating multiple
versions, or any similar information. Under these cir-
cumstances, the trial court did not abuse its discretion
in determining that the "defendant ha[d] failed to estab-
lish that she created or compiled any of the documents
contained in exhibit A on the advice of counsel," absent
any evidence that the defendant (1) created the docu-
ments for, or at the request of, her attorney, (2) intended
to communicate the contents to an attorney, or (3)
actually communicated them to an attorney.

The defendant also contends that the trial court
improperly precluded expert testimony that would have
supported her argument that the documents within
exhibit A are privileged. Specifically, during the *Lenarz*
hearing, she proffered Attorney William F. Dow III as
"an expert in criminal law . . . an expert [in] the pro-
tections afforded to [the defendant] under the state
constitution for search and seizure . . . [and] as an

because the defendant had established the necessary element of communica-
tion. Id., 423; see id., 458 n.5 (*Palmer*, *J.*, dissenting). On appeal to this
court, the state in *Lenarz* did not contest the propriety of that procedure.

In the present case, the defendant requested an ex parte hearing and
offered to submit a sworn affidavit. The state objected, and the trial court
did not permit ex parte testimony from the defendant. We express no view
about whether the trial court could appropriately permit the defendant to
create a record in this fashion because the defendant does not brief the
issue in this appeal.

The trial court excluded and did not consider the direct testimony of
Karpe or any of his testimony on cross-examination on the basis of defense
counsel's invocation of the attorney-client privilege during Karpe's testimony
on cross-examination. We similarly do not consider any of Karpe's testimony
on direct or cross-examination, as it is not part of the factual record.

State *v.* Kosuda-Bigazzi

expert as to privilege.'' Dow also would have opined ''on the ultimate remedy and . . . on the constitutional violations that occurred here.'' The defendant also proffered Attorney Hubert J. Santos as an expert to provide similar testimony—that the documents were covered by the attorney-client privilege. The trial court precluded both experts pursuant to § 7-2 of the Connecticut Code of Evidence,[11] *State* v. *Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012), and *State* v. *Taylor G.*, 315 Conn. 734, 110 A.3d 338 (2015).

''An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. . . . Experts can [however] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass.'' (Internal quotation marks omitted.) *State* v. *Iban C.*, supra, 275 Conn. 634–35. But see id., 636–37 (trial court abused its discretion by admitting testimony on ultimate issue of fact that was not helpful to jury in deciding precise question on which it had to pass).

In the present case, the trial court determined that the expert testimony of Attorneys Dow and Santos would have improperly infringed on the court's function, would not have assisted the court as the trier of fact, improperly included conclusions of law, and would have been cumulative of the testimony of Dubois. We conclude that the trial court did not abuse its discretion in precluding both experts from testifying. The court's decision was reasonable because neither Dow nor Santos could have provided any information that would have been of assistance to the court in determining

---

[11] Section 7-2 of the Connecticut Code of Evidence provides: ''A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue.''

State *v.* Kosuda-Bigazzi

whether, as a matter of fact, the defendant had created any of the documents for the purpose of seeking legal advice. Neither Dow nor Santos could have provided any additional evidence as to whether the documents qualified as communications made by the defendant to her attorney because neither of them had any knowledge relating to the defendant's intentions in creating the documents, which is the key element necessary to establish the applicability of the attorney-client privilege. Moreover, the content of the defendant's proffer of the testimony of Dow and Santos was cumulative of Dubois' testimony and centered on an ultimate issue— whether the defendant established that the documents were privileged—that was a determination for the trial court alone to make. See Conn. Code Evid. § 7-3 (a) (''[t]estimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue'').

2

The defendant next asserts that the manner in which she maintained the documents is sufficient to establish that the documents are privileged. We are not persuaded. We credit the defendant's characterization that exhibits A and B were ''carefully maintained'' files under lock and key, located ''centimeters apart from one another'' in ''two different folders nestled together,'' rather than loose pieces of paper left unprotected in the office in the defendant's home in which they were seized. Nothing in the record contradicts that characterization. However, the mere fact that exhibit A, labeled ''INCIDENT 2017,'' was located next to exhibit B, labeled ''CRIMINAL DEFENSE ATTORNEY Oct 2017,'' by itself, does not serve to transfer the privilege from one file to another. That kind of proximity argument—

State *v.* Kosuda-Bigazzi

documents located adjacent to nearby related privileged documents are also privileged—simply does not measure up to the well established standard of proof for establishing privilege and would lead to illogical results.

For example, if an attorney were inadvertently to disclose a privileged e-mail communication within a batch of hundreds of communications, that attorney could hardly argue that the privilege should somehow transfer to all the e-mails in the batch simply because they were "nestled together." See *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 331 n.29 (declining to "transfer" privilege from one confidential e-mail covered by privilege to another nonconfidential e-mail, even though e-mails were related in time and general subject matter). More troubling is the fact that the defendant's proximity argument flies in the face of the well established principle that the privilege must be established for each document separately. See, e.g., *Harrington* v. *Freedom of Information Commission*, supra, 323 Conn. 12. The defendant cites no case law, and we have found none, that supports the proposition that placing a document next to a privileged document transforms what would be a nonprivileged document into one protected by the attorney-client privilege.

Instead, the defendant asks us to substitute her preferred logic—which we do not find inescapable—for concrete evidence that would establish that she intended to communicate the documents within exhibit A for the purpose of seeking legal advice. Practically speaking, it is at least as plausible an inference that the defendant created two separate files, labeled differently, with two different purposes or intentions in mind. The file labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017," which contains documents pertaining to trial strategy, could be viewed as the file the defendant created for her current or prospective attorney. Labeling, after all, can be one indication of whether a communica-

State *v.* Kosuda-Bigazzi

tion is intended to seek or to provide legal advice.[12] Compare *Lash* v. *Freedom of Information Commission*, 300 Conn. 511, 519–20, 14 A.3d 998 (2011) (document expressly labeled ''CONFIDENTIAL Attorney-Client Communication DO NOT DISCLOSE'' and transmitted from assistant town attorney to first selectman for purpose of providing legal advice was covered by attorney-client privilege (internal quotation marks omitted)), with *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 675 n.13, 757 A.2d 1 (2000) (memoranda labeled ''CONFIDENTIAL-ATTORNEY CLIENT PRIVILEGE,'' but ''not created for the purpose of obtaining legal advice'' and in which no legal advice was sought, were not covered by attorney-client privilege (internal quotation marks omitted)), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001). The label on exhibit A, ''INCIDENT 2017,'' on the other hand, does not, on its face, manifest the same intent to seek legal advice as the file labeled ''CRIMINAL DEFENSE ATTORNEY Oct 2017.'' We need not—and ought not—speculate as to the defendant's intent in creating the separately marked

---

[12] Although labeling reflects one indication of an intent to communicate a document or a file of documents to an attorney, certainly, labeling a file ''Confidential Attorney-Client Privilege'' would not be sufficient on its own to establish that the privilege covers every document within the file. See *Fisher* v. *United States*, supra, 425 U.S. 403 (''since the privilege has the effect of withholding relevant information from the [fact finder], it applies only where necessary to achieve its purpose''). Indeed, our in camera review of the documents within exhibit B reveals that it is by no means obvious that certain documents are privileged, for example, a certificate of baptism from 1947, a copy of a parking meter receipt, a printout of a facsimile receipt log from 2012, and printed directions from the website Mapquest. The parties do not challenge the trial court's acceptance of their written stipulation that the contents of exhibit B are privileged, and we, therefore, decline to analyze each document within exhibit B to evaluate its privilege status. See part I of this opinion. That conclusion, however, does not prevent this court from analyzing and deciding the issues on which the parties in fact disagree— whether the defendant established that the privilege covers the documents within exhibits A and C, and whether *Lenarz* compels the dismissal of the charges against her.

State *v.* Kosuda-Bigazzi

files. Rather, the defendant bore the burden of proving that her intent in creating the documents within exhibit A was to communicate the information for the purpose of seeking legal advice. See *Harrington* v. *Freedom of Information Commission*, supra, 323 Conn. 12. She did not meet that burden by relying on the proximity of the documents.

3

The defendant urges us to conclude that the documents are sufficient in and of themselves to be considered privileged because their content is obviously useful to preparing her defense. We are not persuaded. Although it is true that documents containing information relating to the actual express communications between individuals and their attorneys may, on their face, establish the communication element necessary to invoke the privilege; *United States* v. *DeFonte*, supra, 441 F.3d 95; the documents within exhibit A do not reflect actual communications between the defendant and her attorney. Exhibit A contains three categories of documents: (1) handwritten documents describing the incident that led to the decedent's death and the conditions leading to it, (2) handwritten documents describing a health related problem of the defendant, and (3) printouts from a medical provider summarizing the defendant's visit and evaluation there in April, 2008, and containing handwritten phone numbers in the margins.

The trial court did not clearly err in determining that the defendant did not establish that the third category of documents, the medical records, were anything other than preexisting documents that were outside the scope of the attorney-client privilege. They predate the incident that gave rise to the attorney-client relationship by about nine years, and the defendant introduced no evidence to establish that they were created for the purpose of seeking legal advice. If the defendant thought

that the documents could aid in her defense, brought them to her attorney, and discussed the information contained therein, she may have been able to establish that the conversation about the information would be privileged, but not the documents themselves. See 1 Restatement (Third), supra, § 69, comment (j), pp. 529– 30 ("A client may communicate information to a lawyer by sending writings or other kinds of documentary or electronic recordings that came into existence prior to the time that the client communicates with the lawyer. The privilege protects the information that the client so communicated but not the [preexisting] document or record itself.").

On the basis of the record, we agree with the trial court that the defendant failed to establish whether the first two categories of documents (the handwritten notes describing the incident that led to the decedent's death and the medical issues) were created for the purpose of seeking legal advice or created for some other personal purpose and are more properly characterized as preexisting documents. None of these handwritten documents reflects notes describing actual communications or memorializations of communications between the defendant and her attorney.

Documents that do not reflect actual communications between attorney and client require additional evidence by the party asserting the attorney-client privilege to establish that they were created for the purpose of seeking legal advice and that actual legal advice was sought or intended to be sought. In the present case, the defendant did not adduce any additional evidence to establish that she created the documents for the purpose of seeking legal advice or that she communicated or intended to communicate the documents to her attorney. Without more, the defendant has not established that the trial court clearly erred in determin-

State *v.* Kosuda-Bigazzi

ing that she failed to establish that the documents within exhibit A are privileged communications.

The defendant asks us to rely on an intermediate appellate court case from the state of Washington for the proposition that the content of written materials, such as those contained within exhibit A, suffices to establish intent and, therefore, that the documents within exhibit A warrant the protection of the attorney-client privilege. See *State* v. *Perrow*, 156 Wn. App. 322, 231 P.3d 853 (2010). In *Perrow*, the Washington Court of Appeals upheld the trial court's dismissal of criminal charges against the defendant on the ground that he was prejudiced when a police detective seized, reviewed and analyzed privileged documents that the defendant had prepared at the direction of his attorney. Id., 325–26. *Perrow* is clearly distinguishable from the present case.

In *Perrow*, the trial court made the following findings: "(1) . . . [the defendant] retained the services of . . . an attorney; (2) [the attorney's] representation involved . . . representation during the investigative stage of the potential criminal charges . . . (3) [the defendant] was aware of [the] allegations based on his conversation with [the detective] . . . (4) [the attorney] first met with [the defendant] . . . after previously speaking with him by telephone and receiving faxed documents concerning the allegations; (5) [the attorney] asked [the defendant] to provide him with information about . . . [the] allegations; (6) during . . . [a] meeting, [the attorney] asked [the defendant] to gather additional information and to put that information into writing; (7) [the defendant] prepared written materials for his attorney which consisted of a green composition book, a black composition book, miscellaneous notes located in his office, and a yellow [notepad]; and (8) [the attorney] met with [the defendant] . . . to review the information and [to] discuss the case." Id., 329. On the basis of those findings, the trial court concluded: "An [attorney-client] relationship had been formed and existed at

State *v.* Kosuda-Bigazzi

the time the papers and notebooks were seized . . . .''
(Internal quotation marks omitted.) Id. The state, on
appeal, did not challenge those findings, and the appel-
late court agreed that the privilege applied. Id., 329–30.

So far as the elements necessary to establish the applic-
ability of the attorney-client privilege in Washington are
consistent with our jurisprudence on the privilege, the
defendant in the present case has failed to establish
nearly every single element that the defendant in *Per-
row* established. Although there is evidence within
exhibit B that the defendant spoke to several attorneys,
the defendant did not establish that she retained the
services of her attorney prior to the execution of the
search warrant. Nor did she establish that she met with
her attorney prior to preparing the documents or that
her attorney asked her to prepare information about
the allegations. Finally, she did not establish that she
prepared the written materials for her attorney or that
she met with her attorney for the purpose of having
counsel review those materials. We therefore conclude
that the trial court did not clearly err when it declined
to blanket these documents with the protection of the
attorney-client privilege without evidence of the defen-
dant's intent to create the documents for the purpose
of seeking legal advice.

4

Relatedly, the defendant argues that the documents
within exhibit A are covered by the attorney-client privi-
lege because they are substantively identical to, or are
copies of, documents contained within exhibit B. The
defendant asserts that, because the parties stipulated
that the contents of exhibit B are privileged, the con-
tents of exhibit A must also be privileged. The defendant
argues that, because almost every one of the approxi-
mately twenty-five pages within exhibit A is substan-
tively identical to some of the approximately 150 pages

State *v.* Kosuda-Bigazzi

within exhibit B, "[i]t makes no sense that the same statement and documents that the state admitted were privileged in one file were not in another [file] . . . ." We disagree. Our review of the documents contained within exhibits A and B confirms that, with the exception of one document with the name, phone number, and date of contact with a medical doctor, the entire contents of exhibit A are substantively identical to documents also contained within exhibit B. However, on this record, we are unable to agree with the defendant that she has demonstrated that the documents within exhibit A are covered by the attorney-client privilege.[13]

We disagree with the defendant's statement that the documents are "the same . . . ." In fact, the documents are not "the same . . . ." Both exhibit A and exhibit B contain "the narrative" document, but they are not exact copies because the defendant's initials are in different locations on the pages. See footnote 5 of this opinion. Additionally, there are many versions of the narrative describing the incident that led to the decedent's death that are told in substantively different ways and are of different lengths and detail. This is not a case in which a lawyer or client printed an e-mail exchange that took place (a communication) and kept one physical copy in a file folder and saved a duplicate copy in an electronic file. The present case is notably

_____

[13] Exhibit A is made up not of the original documents seized from the defendant's home but of photocopies made by the police. Therefore, our ability to review the documents is somewhat hampered. The trial court did not make a finding as to whether the materials in exhibit A were exact copies of the documents within exhibit B (which is made up of the documents actually seized from the defendant's home). Although the contents of the narratives are identical, the documents have different markings. For example, the narratives in exhibits A and B contain the initials of the defendant and the year in different locations on the pages. See footnote 5 of this opinion. The defendant did not establish which narrative she handwrote first, when she made copies, or when and for what purpose she marked those copies differently. As noted in footnote 3 of this opinion, the trial court has sealed exhibit B. We have reviewed exhibit B in camera and necessarily describe the documents within it only generally.

distinct from that scenario—most importantly because the documents are not, on their face, communications between attorney and client. The file contains a variety of documents—some that appear to be more like journal entries, others more narrative in style and describing traumatic events, and others that are clearly preexisting documents. See part II A 3 of this opinion. Nothing within the documents suggests that the writings reflect communications between the defendant and her attorney. Finally, the defendant has not established, and we cannot infer, that the documents were created at the behest of an attorney and for the purpose of seeking legal advice. The documents could just as easily be viewed as preexisting documents created for some other personal reason. Simply stated, nothing in the record supports the defendant's position that the documents within exhibit A are identical copies of privileged communications.

The defendant next claims that the state's stipulation as to exhibit B should transfer to exhibit A to render the documents within exhibit A privileged. This argument is belied by the trial court record. Notably, the defendant did not raise this issue before the trial court. Rather, both parties proceeded with the *Lenarz* hearing under the assumption that the stipulation applied only to exhibit B, not exhibit A. The defendant initially proposed the idea of a stipulation toward the end of the first day of the *Lenarz* hearing. Defense counsel addressed the trial court, stating: "In the effort to streamline this process because these examinations have been—they got to be excruciating to listen to— through the court, I was going to ask that the state, if [it] would stipulate to the fact that the criminal defense attorney file, labeled October, 2017 . . . is privileged. Would the state stipulate to that?" The defendant had first discussed the idea with the state over the preceding trial court break. The state responded: "I thought that was the whole purpose of this hearing, Your Honor.

State *v.* Kosuda-Bigazzi

And, obviously, this is the first that I'm hearing of it. If counsel had brought this to my attention a week ago, three days ago, I could have actually reflected on that and done, you know, my due diligence . . . . I am remiss at this point to do that at this exact moment.''

On the second to last day of the *Lenarz* hearing, the state agreed to the defendant's suggestion that the parties stipulate to the privilege covering the contents of exhibit B. The written stipulation provided in relevant part: ''The aforementioned blue accordion folder marked ''CRIMINAL DEFENSE ATTORNEY Oct 2017'' and its contents are protected by the attorney-client privilege . . . .'' Before accepting the stipulation, the trial court discussed the matter with the parties on the record.[14] It was clear from this discussion that defense counsel, the prosecutor, and the trial court all understood that the state had stipulated that the privilege applied only to the content of exhibit B (as the defendant had initially suggested), and that the state contested the privilege as to the contents of exhibits A and

---

[14] The following colloquy took place:

''The Court: . . . That's a stipulation, the state, stipulating, Attorney Watson, that exhibit B . . . in its entirety [consists of] items protected by the attorney-client privilege?

''[The Prosecutor]: That's the basis of the stipulation, Your Honor. What I've discussed with [defense counsel] is that the state didn't feel as though it could make an argument to the court in light of the evidence that was adduced at trial that would support a finding that it wasn't. So, the state entered into that stipulation agreement with [defense counsel], specifically as it pertains to [exhibit B], which is the criminal defense attorney file marked October . . . 2017; *that stipulation doesn't cover, as it's—it's not specifically indicated in that document, but it doesn't cover* [exhibits A and C]. . . .

''The Court: And, with specificity, *the state is not stipulating and is contesting whether or not the contents of state police* [*exhibit A and C*] *are privileged*?

''[The Prosecutor]: Correct, Your Honor. . . .

''The Court: Had you discuss[ed] this with your client? . . .

''[Defense Counsel]: Yes, Your Honor. . . . I faxed a copy to her. We reviewed it. We discussed it on multiple occasions over the weekend, and she agrees with the same.'' (Emphasis added.)

State *v.* Kosuda-Bigazzi

C. Defense counsel stated that he had discussed the stipulation with the defendant on multiple occasions and that she also agreed to the terms of the stipulation.

The record and the written agreement establish that the parties intended that the attorney-client privilege would apply only to the contents of exhibit B, not exhibit A. The parties voluntarily entered into an agreement setting to rest their dispute about the privilege covering the contents of exhibit B. See, e.g., *Gillis* v. *Gillis*, 214 Conn. 336, 339–40, 572 A.2d 323 (1990). In this appeal, the defendant would have us alter that agreement by extending the stipulation to protect the contents of exhibit A as privileged. We decline to do so. See, e.g., id., 340 (a "stipulation . . . cannot be altered or set aside without the consent of all the parties, unless it is shown that the stipulation was obtained by fraud, accident or mistake" (internal quotation marks omitted)). This stipulation, in and of itself, is insufficient to warrant extending the privilege to the contents of exhibit A. Under the circumstances of this case, a stipulation as to one document cannot serve to establish that different versions of substantively identical documents located in a different file are records of a communication or that the defendant created the new versions of the documents for the purpose of seeking legal advice. To conclude otherwise could expand the privilege to cover documents that have no indicia of a communication between attorney and client. The attorney-client privilege does not serve that purpose. The privilege is narrowly applied, strictly construed, and applies only when necessary to foster full and frank *communications* between attorneys and their clients. See, e.g., *Harrington* v. *Freedom of Information Commission*, supra, 323 Conn. 12. That interest is not served by permitting a blanket application of the privilege to these documents within exhibit A, for which the defendant has offered no evidence to establish that she either com-

362 OCTOBER, 2020 335 Conn. 327

State *v.* Kosuda-Bigazzi

municated with or intended to communicate with her attorney for the purpose of seeking legal advice.[15]

B

Exhibit C is referred to by the parties as the defendant's estate planning file. According to the defendant, all of the documents within the file should be covered by the attorney-client privilege as communications made to an attorney for the purpose of drafting a will, pursuant to *Gould, Larson, Bennet, Wells & McDonnell, P.C.* v. *Panico*, 273 Conn. 315, 869 A.2d 653 (2005). In *Panico*, we reasoned that a draft of an unexecuted will is a form of communication. Id., 323. We concluded that communications, in the form of drafts of a will, between a client and an attorney that do not result in an executed will are privileged. Id., 320. The defendant's reliance on *Panico* is unavailing, however, because exhibit C contains an *executed* will, not a draft of a will that would be considered a communication within the context of a will dispute. The estate planning attorney who prepared the defendant's will did not testify during the *Lenarz* hearing to establish that the documents within the estate planning file were communicated to her by the defendant for will preparation purposes or to develop a trial strategy. The defendant herself did not testify. The defendant relies exclusively on the testi-

[15] The state asserts in its brief to this court that the defendant waived the privilege as to exhibit A by failing to claim it at the time of the police search of her home, at the time of her arrest, or at her arraignment. According to the state, the defendant was the only person who knew about the existence, location, and placements of the documents in her home, and she alone had the "responsibility to assert and maintain [the attorney-client privilege] . . . and failed to do so." (Citation omitted.) Our precedent on the issue indicates that "[voluntary] disclosure of confidential communications . . . constitutes a waiver of [the] privilege as to those items." (Internal quotation marks omitted.) *Harp* v. *King*, 266 Conn. 747, 767, 835 A.2d 953 (2003). Because we conclude that the trial court did not err in determining that the defendant failed to establish that the documents within exhibit A are covered by the privilege, however, we need not reach the issue of whether she waived the privilege.

State *v.* Kosuda-Bigazzi

mony of Dubois, who testified that, in his expert opinion, the documents were privileged. The trial court permitted Dubois' testimony as to the defendant's hearsay statements of intent solely as a foundation for his expert opinion, not for the truth of whether the defendant actually intended to communicate, or communicated, the documents to her attorney. See part II A 1 of this opinion. We therefore have no record as to whether the documents within the file were in fact documents created, or communicated to an attorney, for the purpose of seeking legal advice.

The privilege protects *communications* between client and attorney for the purpose of seeking legal advice; *Ullmann* v. *State*, 230 Conn. 698, 711, 647 A.2d 324 (1994); and the defendant must meet her burden of establishing that what she claims is protected by the privilege was in fact a communication between herself and her attorney. Unlike exhibit A, exhibit C contains documents that appear to be reports or invoices generated by third parties, for example, a life insurance policy statement. Such documents could be considered communications if the defendant has established that they were communications inextricably linked to the giving of legal advice. See, e.g., *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 168 (upholding Appellate Court's conclusion that report compiled by third party was covered by attorney-client privilege because attorney hired third party to assemble report so attorney could provide appropriate legal advice to client and report was "connected intimately to the rendering of legal advice"). In *Olson*, the attorney had written suggestions on a report compiled by a third party reflecting the attorney's legal opinion, and those suggestions directly related to how the client should respond to a state environmental compliance order. See id., 167–68.

Additionally, the trial court record in *Olson* established that the attorney had hired the third party to

State *v.* Kosuda-Bigazzi

conduct studies and to assemble a report so that the attorney "could utilize . . . facts [contained in the studies and report] in tendering legal . . . advice to the defendant in anticipation of possible litigation . . . ." Id., 165. In that case, the record and the documents supported a conclusion that the report amounted to a communication between the client and the attorney. See id., 168. The record and the documents in the present case are insufficient to support the defendant's assertion that the documents contained within exhibit C were communications inextricably linked to the giving of legal advice.

In light of the defendant's having offered no evidence to the trial court that the documents within exhibit C should be covered by the attorney-client privilege, we find no factual basis to support a conclusion that many of the documents within exhibit C are privileged, preexisting documents. Exhibit C includes statements and invoices from home oil deliveries, home electricity and water company statements, and photocopies of business cards. Other documents within exhibit C include an original and two copies of a power of attorney, an invoice from the attorney who prepared the power of attorney, a life insurance premium statement, and two copies of a document written by the decedent in 2007 describing his wishes for the final disposition of his body after his death.

More important, the documents within exhibit C do not contain anything suggestive of the defendant's trial strategy. When the state invades an individual's attorney-client privilege, as long as the documents are not trial strategy, the defendant bears the burden of establishing that her prosecution will be prejudiced. See *State* v. *Lenarz*, supra, 301 Conn. 427–28 n.8.

The trial court did not clearly err in determining that the defendant did not satisfy her burden of establishing that she communicated, or intended to communicate,

335 Conn. 327 OCTOBER, 2020 365

State *v.* Kosuda-Bigazzi

the documents to an attorney for the purpose of seeking legal advice or that the documents are in any way prejudicial to her prosecution.[16]

III

Having concluded that the trial court correctly determined that the defendant had failed to establish that the documents within exhibits A and C are protected by the attorney-client privilege, we next consider whether the prejudice to the defendant from the invasion of the privilege regarding exhibit B can be cured by a remedy short of dismissal of the charges against her. In doing so, we must consider the state's conduct and any prejudice to the defendant. The defendant contends that she was prejudiced in two ways: (1) investigators and prosecutors had access to privileged communications that would impact her right to effective counsel and a fair prosecution—the issue in *Lenarz,* and (2) her privileged communications had been exposed to the *general public* to the point that she would not be able to select an impartial or unbiased jury. Cf. *State* v. *Reynolds*, 264 Conn. 1, 224–25, 836 A.2d 224 (2003) (motion for change of venue properly denied when pretrial publicity was not so pervasive or prejudicial as to require new venue, and there was no reason to believe that any influence from such publicity could not be overcome by voir dire process), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). We con-

___

[16] The trial court found that a limited number of documents within exhibit C were covered by the privilege but did not identify those documents. The state does not challenge the trial court's conclusion that certain documents within exhibit C are privileged. Rather, the state contends that, because none of the documents within exhibit C reflects "trial strategy," the defendant bears the burden of establishing that she has been prejudiced by any invasion of the attorney-client privilege as to those documents. See *State* v. *Lenarz,* supra, 301 Conn. 427–28 n.8. The trial court did not abuse its discretion in determining that the defendant did not put forth evidence to establish that dismissal of the charges against her is warranted on the basis of prejudice to her prosecution resulting from the fact that the police read the contents of exhibit C. See part III of this opinion.

State *v.* Kosuda-Bigazzi

clude that the trial court's comprehensive order for the further prosecution of the case can serve to cure any prejudice because the state's conduct and the prejudice to the defendant did not rise to the level of that in *Lenarz*. Individual voir dire of prospective jurors can serve to mitigate any prejudice that the defendant may have suffered as a result of the public's exposure to privileged materials.

This court reviews the remedy ordered by the trial court—including the denial of the defendant's motion to dismiss the criminal charges—for abuse of discretion. See *State* v. *Lenarz*, supra, 301 Conn. 443 ("the decision to grant or deny a motion to dismiss a criminal charge rests within the sound discretion of the trial court, and is one that we will not disturb on appeal absent a clear abuse of that discretion" (internal quotation marks omitted)). For guidance, we look to our analysis in *Lenarz*, in which we concluded that the state's conduct and the prejudice to the defendant in that case warranted dismissal of the charge of which he had been tried and convicted. See id., 419. In *Lenarz*, the police seized the defendant's computer and sent it to the state forensic science laboratory to be forensically searched. Id., 420. The next day, defense counsel advised the trial court that materials in the computer were attorney-client privileged. Id. The trial court issued an order providing that any communications between the defendant and defense counsel should remain unread. Id. The state laboratory discovered written materials in the computer containing detailed discussions of the defendant's trial strategy. Id., 421. One document, titled "[s]trategy [i]ssues," listed objectives for a court appearance by the defendant. (Internal quotation marks omitted.) Id., 442. Another document stated near the top of its first page that "[t]he following material is confidential and I would ask that you review it." (Internal quotation marks omitted.) Id., 441–42. A third document stated within its first two sentences that

State *v.* Kosuda-Bigazzi

the defendant had been asked to keep a log of events pertinent to the case and that "[t]his document is the result . . . ." (Internal quotation marks omitted.) Id., 442.

Having found and read the documents, state laboratory personnel copied them and sent them to the police department. Id., 421. The police department forwarded them to the prosecutor, who provided copies for defense counsel. Id. The trial court ordered the police and the prosecutor to turn over any questionable materials to the court and ordered the materials to be placed under seal. Id. The prosecutor did not dispute that he had maintained possession of the materials for six weeks. Id.

On appeal, we explained that the documents that the prosecutor had read, copied, and held contained "highly specific and detailed" communications about the defendant's "trial strategy." Id., 439. The state, by reading those documents, invaded the defendant's attorney-client privilege. Rather than placing the burden on the defendant to establish that he was prejudiced as a result of the invasion, we concluded that, when the materials reveal a defendant's trial strategy, prejudice to the defendant may be presumed. Id., 425. Knowledge of a defendant's trial strategy, after all, threatens a defendant's sixth amendment right to the assistance of counsel because "[f]ree two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful." (Internal quotation marks omitted.) Id., 434. We also explained that the state may then "rebut that presumption by clear and convincing evidence." Id., 425. Ultimately, in *Lenarz*, we concluded that the state had failed to rebut the presumption, specifically because the prosecutor, after reviewing materials containing trial strategy, tried the case to conclusion, and the prejudice caused by the state's intrusion into the

State *v.* Kosuda-Bigazzi

defendant's attorney-client privilege would have been irreparable on retrial. Id., 426. We therefore reversed the judgment of conviction and remanded the case to the trial court with direction to grant the defendant's motion to dismiss the charge of which he had been convicted and to render judgment thereon. Id., 452.

To be sure, some aspects of the search and seizure of the defendant's documents in the present case give us pause, and there is room for improvement in the training of police officers. No officers should read out loud the contents of potentially privileged documents. Once aware that documents are potentially privileged, officers should take immediate steps to prevent any further invasion of the privilege or prejudice to any individual. The officers executing the second search warrant of the defendant's home in the present case clearly should have exercised greater caution in handling the privileged and potentially privileged documents that they discovered. However, the pretrial remedial measures promptly taken by the state support a conclusion that the trial court did not abuse its discretion when it concluded that the conduct at issue did not rise to the extreme level of warranting a dismissal of the charges against the defendant, as was the case in *Lenarz*.

On February 6, 2018, detectives, including Detectives Corey Clabby and Edmund Vayan, arrived at the defendant's home to execute a search warrant. Clabby testified at the *Lenarz* hearing that, during their search, they found several locked file cabinets. Before unlocking any of the file cabinets, they waited "several hours" for the second search warrant to arrive. Eventually, the crime scene supervisor, Lieutenant Mark Davison, decided to proceed, and Vayan cut most of the locks to examine the contents of the drawers.[17] Clabby found

_____

[17] The record is unclear as to whether the locks were cut before or after the second search warrant was issued or after it was brought to the officers at the defendant's home by Fitzsimons. The trial court found that the docu-

and took out exhibit B, labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017." He read through the file in its entirety.

When defense counsel questioned Clabby as to why he read through a file clearly marked for a lawyer, Clabby responded that he could not tell whose file it was. He stated that there were two people living in the home— the defendant and the decedent—and that he did not know who the documents belonged to at the time. He did not recall seeing the defendant's name or signature on any of the documents, and, thus, he could not verify whether the writings belonged to the defendant. He also testified that, in his experience, contacting an attorney before an arrest would be unusual and that he "had no evidence to support the fact that [the defendant] had contacted the attorney at that time." After progressing through the file, Clabby began to realize that it was likely that exhibit B did in fact belong to the defendant. He nonetheless continued to read through the entire file.

Clabby also looked through exhibit A, labeled "INCI-DENT 2017," which was located directly behind the "CRIMINAL DEFENSE ATTORNEY Oct 2017" file. The trial court credited Clabby's testimony that he read out loud from a document located in the incident file but never read out loud from documents located within the criminal defense file.[18] Several other detectives were present when Clabby read from the incident file. Clabby

_____

ments were seized during the execution of the second search warrant. Neither party challenges this finding in this appeal, and the issue of the legality of the search under the fourth amendment to the United States constitution is not before us.

[18] To the extent that the defendant argues that Clabby either read from the criminal defense file or read out loud from the incident file after intentionally locating a similar document within the incident file, the trial court explicitly credited Clabby's testimony as to how the discovery and reading of documents proceeded. As a reviewing court, we defer to such credibility determinations. See, e.g., *State* v. *Kendrick*, 314 Conn. 212, 223, 100 A.3d 821 (2014).

State *v.* Kosuda-Bigazzi

testified that he did not discuss the contents of the files with the other state troopers on the scene. Clabby further testified that, when he realized the gravity of the contents of the criminal defense file, he called Vayan into the room, they discussed the matter, and brought it to the attention of Davison. Clabby testified that he then placed the documents in a banker's box so that they could be moved to the living room for processing. Vayan corroborated the sequence of events outlined by Clabby, and the trial court credited Vayan's testimony as well.

Preleski testified as to how the prosecution of the defendant proceeded following the February 6, 2018 search and seizure of the documents. Preleski testified that Watson, the prosecutor, contacted him on March 19, 2018, regarding the seized documents. That same day, Preleski personally reviewed the documents and became concerned "that there may have been documents that were covered by the attorney-client privilege." The following day, March 20, 2018, Preleski notified defense counsel, and the administrative judge, who also was the presiding criminal judge for the New Britain judicial district, about the nature of the documents. The materials were then submitted under seal to the court on either March 21 or 22, 2018. Within those few days, Preleski also alerted Chief State's Attorney Kevin T. Kane to indicate to him that he "[felt] that we had a *Lenarz* issue in the office with respect to . . . those documents."

About two months later, on May 10 and 11, 2018, Preleski and Kane reviewed all of the seized documents after deciding that Preleski's office, inclusive of the prosecutor, Watson, "would, in substance, become the taint team"—"a separate group of government attorneys who would be responsible for litigating any issues that may arise concerning the government examination of [the] defendant, but who would not communicate what they learned to the prosecutors." *United States*

State *v.* Kosuda-Bigazzi

v. *Taveras*, 233 F.R.D. 318, 320 (E.D.N.Y. 2006). Between May 17 and 21, 2018, Preleski conducted interviews to determine whether the state police Western District Major Crime Squad could continue in an investigatory role. Preleski and Watson decided that the case would be removed from the Western District Major Crime Squad and that any further investigation would be handled by the state police Central District Major Crime Unit. Individuals from the Western District Crime Squad were told not to discuss the contents of the documents they had seized.

Preleski also testified that he and Watson decided that the case, moving forward, would be handled by the Hartford judicial district under the direction of Hartford State's Attorney Gail P. Hardy and Supervisory Assistant State's Attorney Vicki Melchiorre. Preleski testified that he took steps to confirm that the Hartford judicial district had not had any access to the contents of the documents. Preleski recommended, and the trial court adopted, additional steps regarding the sealing of the documents to prevent exposure to the documents by others. The trial court did not adopt Preleski's recommendation to order the case to be handled by the Hartford judicial district. Instead, the court ordered the case transferred to a judicial district to be determined by the chief administrative judge for criminal matters, with input from Kane, to be litigated by prosecutors who had no knowledge of the privileged communications.

Our review of the trial court's remedy regarding the search and seizure of the documents at issue, and the remedial steps instituted following the seizure, leads us to conclude that the trial court did not abuse its discretion by denying the defendant's motion to dismiss the criminal charges against her. Rather, the trial court thoughtfully adopted well reasoned steps that can limit any unauthorized exposure to documents covered by the privilege.

372 OCTOBER, 2020 335 Conn. 327

State *v.* Kosuda-Bigazzi

The character of the majority of the privileged documents that prosecutors read in the present case is quite different from the e-mails between the defendant and his attorney that were implicated in *Lenarz*. Many appear to be common personal documents such as receipts, bills, invoices, etc. Other documents are clearly of a personal and private nature in that they describe a range of traumatic to everyday events of the defendant's life but not communications to an attorney or trial strategy. They read like contemporaneous notes, more akin to journal notes, and, although personal and private, do not obviously suggest a communication with an attorney or a trial strategy. The documents that appear to pose questions for an attorney could have been interpreted as the defendant's thoughts about what a trial strategy might be but are not as specific or detailed as the communications in *Lenarz*. In *Lenarz*, the defendant and the attorney had communicated about specific witnesses and what they would potentially say while testifying during trial. See *State* v. *Lenarz*, supra, 301 Conn. 446–47 and n.22. In the present case, it was not apparent to the detectives reviewing the documents whether the defendant had actually communicated her strategies to her attorney, whether the attorney agreed, who the witnesses might be, or what strategy might be adopted. Even if we assume, arguendo, that some of the documents at issue did outline trial strategy, the state has already conceded that the defendant was prejudiced but argues that the prejudice can be cured by remedial measures.

Also, the trial court in *Lenarz* had alerted the parties that there could be privileged materials in the defendant's computer. See id., 420. The prosecutor in *Lenarz* defied a court order, read privileged materials, and held onto those materials for six weeks before notifying defense counsel. Id., 421. In contrast, the trial court in the present case credited the testimony of witnesses who stated that the exposure to privileged materials

was not intentional. Once alerted to the privileged nature of the documents, the state halted the investigation of the defendant, created a taint team, removed the case from the original investigative body, and assigned new prosecutors. The state's action in the present case was swift, in contrast to the state's actions in *Lenarz.*

Finally, and critical to the issue of remedying prejudice, in *Lenarz,* the case had proceeded through trial to the defendant's conviction with the same prosecutor who had read and held onto trial strategy materials for six weeks. See id., 426. Because the prosecutor had been exposed to the privileged materials, the state had the use of the information in preparing for trial. Id., 445. The record even ''strongly'' suggested that the ''prosecutor may have revealed the defendant's trial strategy to witnesses and investigators''; id.; and, therefore, a remedy short of dismissal of the charges of which the defendant had been convicted, including remand, would not have been appropriate. See id., 444. We explicitly stated in *Lenarz* that one method of curing prejudice is by appointing a new prosecutor who has not been exposed to the privileged materials—the exact remedy that the trial court ordered in the present case before the investigation, which was in its incipient stages, proceeded any further. See id., 451. Thus, we conclude that the trial court in the present case did not abuse its discretion by not dismissing the charges prior to trial and, instead, entering an order intended to protect the defendant from further prejudice.

Regarding the exposure of documents that did occur and any prejudice that the defendant may have suffered as a result of the public's exposure to them, the defendant's constitutional right to individual voir dire of potential jurors under article first, § 19, of the state constitution, which is incorporated in the General Statutes and the rules of practice, can serve to mitigate any

State *v.* Kosuda-Bigazzi

prejudice. See General Statutes § 54-82f; Practice Book § 42-12. "One of the principal purposes of individual voir dire . . . is the discovery of factors that may predispose a prospective juror to decide a case on legally irrelevant grounds . . . . [I]f there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 698–99, 741 A.2d 913 (1999). We are confident that individual voir dire can mitigate any prejudice to the defendant by revealing whether prospective jurors have been exposed to any privileged materials and by uncovering any potential biases. We will not prejudge, before trial, whether the trial court can or cannot ensure the defendant a fair trial. See *State* v. *Reynolds*, supra, 264 Conn. 223 ("A defendant cannot rely . . . on the mere fact of extensive pretrial news coverage to establish the existence of inherently prejudicial publicity. Prominence does not, in itself, provide prejudice." (Internal quotation marks omitted.)).

The defendant contends that she was unable to demonstrate the extent of the prejudice she suffered as a result of the public's exposure to privileged materials because the trial court precluded her from offering the testimony of David Lasker, "an expert witness in the subject matter of quantifying media exposure to the general population through the medium of the Internet, radio and television." According to the defendant, Lasker "would have demonstrated [the existence of] insurmountable prejudice" as a result of the publication in the media of the "narrative" within the arrest warrant application. The trial court permitted the defendant to make an extensive offer of proof as to the testimony of Lasker. On the basis of that proffer, the court determined that Lasker's opinion would not be sufficiently

reliable, would not be relevant, and would not assist the finder of fact in determining whether any prejudice could be remedied. We conclude that the trial court did not abuse its discretion in precluding the expert's testimony at this stage of the proceeding.

The defendant's main concern centered on the fact that the public was exposed to privileged materials when the police quoted from those materials in the arrest warrant application, which the media published. That concern is obviated by our determination that information in the documents within exhibit A that was then recited in the arrest warrant application is not covered by the attorney-client privilege. We conclude that the trial court did not abuse its discretion in precluding the testimony of Lasker on the basis of its articulated justifications and our determination that exhibit A is not covered by the attorney-client privilege. Moreover, we will not presume that the trial court—as in any case—cannot, through individual voir dire and instructions to the jury, ensure that the defendant will not suffer prejudice from media coverage surrounding this case when it proceeds to trial.

Therefore, we conclude that the trial court did not abuse its discretion in determining that dismissal of the charges against the defendant is not warranted and that the state met its burden of showing, by clear and convincing evidence, that the remedial steps it took can cure any presumed prejudice and prevent future prejudice to the defendant.

The trial court's order and decision denying the defendant's motion to dismiss the charges against her are affirmed.

In this opinion the other justices concurred.

McDONALD, J., concurring. I join the majority opinion and agree that, for the purpose of the *Lenarz* hear-

State *v.* Kosuda-Bigazzi

ing; see *State* v. *Lenarz*, 301 Conn. 417, 22 A.3d 536 (2011), cert. denied, 565 U.S. 1156, 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012); the trial court's determination that the defendant, Linda Kosuda-Bigazzi, failed to establish that the documents in exhibits A and C were protected by the attorney-client privilege was not clearly erroneous. I write separately to emphasize the unique factual circumstances of this case and that the trial court's determination was for a specific and limited purpose—to determine whether the criminal charges against the defendant should be dismissed. I do not read the majority opinion as addressing whether the defendant could reassert the attorney-client privilege if circumstances change at trial and the state seeks to affirmatively use this evidence against the defendant.

With respect to part II A of the majority opinion, this case presents a unique factual record that is unlikely to reoccur. Specifically, the documents that the defendant claims are privileged were located within three files, exhibits A, B, and C, in a locked filing cabinet. During the *Lenarz* hearing, the parties stipulated that all the documents contained in exhibit B, a file labeled "CRIMINAL DEFENSE ATTORNEY Oct 2017," were covered by the attorney-client privilege. The defendant contends that the privilege also covers the other two files that were seized by the police, exhibits A and C. The defendant asserts, among other things, that the documents contained in exhibit A, a file labeled "INCIDENT 2017," are privileged because they are substantively identical to some of the documents contained in exhibit B, which the state stipulated are privileged. Because the defendant did not establish that the documents in exhibit A are "communications" or that she created them with the intent to communicate them to an attorney for the purpose of seeking legal advice, I agree with the majority that the trial court's conclusion that the defendant failed to meet her burden of establishing that those

State *v.* Kosuda-Bigazzi

documents are privileged was not clearly erroneous. This determination, however, is based on the record solely as it was developed at the *Lenarz* hearing and does not necessarily preclude the defendant from reasserting the privilege at trial if the state seeks to affirmatively use this evidence against the defendant. That would present a different evidentiary issue. Cf. *State* v. *Casanova*, 255 Conn. 581, 594, 767 A.2d 1189 (2001) ("[the law of the case] doctrine is inapplicable here because the issue raised by the pretrial motion to dismiss was different from the evidentiary issue subsequently presented to the trial court"). The trial court's privilege determination was made in the context of determining whether the charges against the defendant should be dismissed in accordance with our decision in *State* v. *Lenarz*, supra, 301 Conn. 425–26, not whether the documents would be admissible at trial.

Accordingly, I concur in the majority opinion.